The **DOW CHEMICAL COMPANY,**
Plaintiff,

v.

**TEXACO REFINING AND MARKETING, INC.,**
Defendant.

Civ. A. No. 2:94cv449.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 22, 1995.

---

Morton H. Clark, Henry P. Bouffard, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for plaintiff.

Glen A. Huff, David N. Ventker, Huff, Poole & Mahoney, Virginia Beach, VA, for defendant.

## FINAL OPINION AND ORDER

MORGAN, District Judge.

Plaintiff The Dow Chemical Company brought this action against defendant Texaco Refining and Marketing, Inc. for the breach of a bareboat charter for a tugboat and barge. The Court presided over the trial from March 20, 1995 to April 6, 1995.

### I. FACTUAL AND PROCEDURAL HISTORY

The Dow Chemical Company ("Dow") is a corporation registered in Delaware with its principal place of business in Houston, Texas. Texaco Refining and Marketing, Inc. ("Texaco") is a corporation registered in Delaware with its principal place of business in White Plains, New York. Dow brings this admiralty claim pursuant to 28 U.S.C. § 1333(1), and asserts that both parties have agreed to venue in this Court.

Dow contracted in the late 1970's for the construction of a tugboat and a barge in order to transport petroleum and chemical products to and from Dow facilities.[1] The two vessels were designed to function as an integrated tug and barge unit ("ITB"), by which the bow of the tugboat locked into the stern of the barge allowing the tugboat to maneuver the barge. The tugboat, named the SEA SKIMMER, was constructed in 1980 by fitting a new bow section with two stern pieces from World War II-era vessels. The tugboat contains a specially designed bow section, called a Bludworth system, which locks into a V-shaped notch in the stern of the barge.[2] The tugboat is classified

---

**1.** Although the charter party refers to Dow as the owner of the vessels, third-party corporations financed the construction and held legal title to the vessels, and chartered the vessels to Dow under a long-term charter party. *See* Defendant's Ex. 61 (Bareboat Charter Agreement between GATX Third Aircraft Corporation and The Dow Chemical Company dated Dec. 8, 1980); Defendant's Ex. 62 (Bareboat Charter Agreement between Security Pacific Equipment Leasing, Inc. and The Dow Chemical Company dated Aug. 1, 1978).

**2.** In a survey report prepared by The Salvage Association, Ltd., the Bludworth Notch System is described:

> The tug is fitted closely into the notch as far as the tug half length, and pushes against a vertical 4″ (thick) × 18″ (deep) steel bar strongly welded into the apex of the notch. The tug bow has a heavy steel fabrication built in, containing a vertical notch which fits over the bar, and two (6″ diameter) steel discs, which lock onto the bar, propelled by a hydraulic ram with a pressure of 4000 p.s.i.

as A–1 Towing Class with the American Bureau of Shipping ("ABS"),[3] but lacks a Maltese Cross designation which indicates that the vessel was not fully constructed under the jurisdiction or survey of an ABS member.

The barge, named the PLAQUEMINE, was built in 1978 to design specifications issued by the United States Coast Guard and the ABS and is classed with the ABS as an A1 tank barge with a Maltese Cross designation.[4] The barge is a double-hulled vessel with eight independent cargo tanks, four on each side of the vessel. Between the hull of the ship and the cargo tanks are ten ballast tanks, five on each side, which are flooded with water to allow for increased maneuverability. Each ballast tank is divided into eleven bays, with each bay composed of steel structural members.[5] The barge originally carried six cylindrical propane tanks on its

deck for storage of gaseous or liquid petroleum products.

Dow never used the tugboat and the barge according to its original plan, and attempted to charter the vessels to third parties. In 1987, through the assistance of a broker, Dow and Texaco entered into negotiations for the charter of the vessels. Texaco researched the history of the tugboat and the barge during negotiations by checking the vessels' history with the ABS and sending Texaco personnel to inspect the vessel visually. On January 30, 1988, the parties agreed to separate bareboat charters for the SEA SKIMMER and the PLAQUEMINE for a period of two years with a right for Texaco to renew the charters for three additional one year terms.

The two bareboat charters, or charter parties, required Texaco to comply with the classification and inspection standards promulgated by the ABS, including the ABS

This is the only positive connection, other than lines between tug bow and notch, which are only connected in port (in case of hydraulic failure whilst maneuvering). Plaintiff's Ex. 20 at 2–3 (The Salvage Association, Ltd. Survey Report dated Dec. 28, 1987).

3. The American Bureau of Shipping is a nonprofit classification society responsible for issuing and monitoring compliance with minimum standards for sea-going vessels. *See* Tr., Mar. 23, 1995, at 8–9. For a vessel to be classed with the ABS, the vessel's plans must be reviewed by the ABS, the building materials and equipment must be certified by the ABS, and an ABS surveyor must be present in the shipyard during construction. *See id.* at 11. The ABS requires periodic surveys to ensure that the vessel continues to meet ABS class requirements. The annual survey inspects the vessel's hull and machinery and may be carried out when the vessel is afloat. The intermediate survey, conducted every two-and-a-half years, is a more intensive inspection of the vessel, specifically the ballast and void tanks, and may be carried out while the vessel is afloat. The special survey is conducted every five years. The most intensive of the ABS surveys, the special survey, is done while the vessel is drydocked. The ABS surveyor inspects all aspects of the vessel to determine whether the vessel meets minimum ABS classification standards and recommends those repairs necessary to maintain its ABS classification rating. *See id.* at 11–13.

The ABS also carries out load line surveys of vessels on behalf of the United States Coast Guard and other foreign countries for the issuance of load line certificates. The load line survey examines the envelope of the vessel, specifi-

cally its structural integrity and watertightness. The ABS issues load line certificates on behalf of the vessel's country of registry. The vessel's load line, the point at which the vessel should operate at loaded and unloaded conditions, is indicated by the Plimsoll mark on the side of the vessel. The ABS also retains the authority to revoke a load line certificate. *See id.* at 15–17.

The ABS surveyor can recommend the issuance of class certification based on his inspection of the vessel. The final decision for issuance or cancellation of class certification, however, lies with an ABS committee composed of maritime industry leaders and senior ABS personnel. The ABS committee reviews all reports and records on the vessel and votes on its decision. *See id.* at 13–14.

4. Defendant's Ex. 436 (Schuller & Allen, Inc. document "Specifications for the Construction of an Ocean Going Tank Barge for Dow Chemical U.S.A.," dated Oct. 21, 1975).

5. Part of the design specifications concern the thickness of the steel frame members of the vessel, referred to as "scantlings." Under ABS guidelines a vessel is built to "full scantlings" when a steel frame member may lose up to 25% of its original size through corrosion or wastage without affecting the structural integrity of the vessel. A vessel built to "reduced scantlings" uses thinner steel with a smaller margin for wastage, and must employ coatings over the steel to prevent corrosion. The ABS classified the PLAQUEMINE as a reduced scantlings vessel. The ABS no longer approves reduced scantling vessels.

drydocking and surveying schedules. The charter parties contained differing provisions with respect to particular sections. The tugboat charter party contained a section on redelivery of the vessel that stated:

Charterer at its expense will redeliver the Vessel to Shipowner in serviceable condition for ships of like age and type and in conformity with the provisions of Section 6 hereof, ordinary wear and tear excepted. At the time of redelivery the Vessel shall have been credited with a classification drydock survey as of a date no more than 36 months prior to such date of redelivery and the Vessel, at such time, shall hold the highest classification and rating of the American Bureau of Shipping for vessels of the same class, age and type....

. . . . .

Within 180 days prior to redelivery, a joint survey shall be made by Charterer and Shipowner to determine the condition and fitness of the Vessel and her machinery and equipment. The cost of such survey shall be paid by Charterer. All repairs and work shown by such survey to be necessary to put the Vessel in the condition required by the preceding paragraph of this Section 24 shall be done and all repairs of damage occurring after such survey shall be made by Charterer at Charterer's expense prior to redelivery, or Charterer shall discharge such obligation by payment for the cost of such repairs and work and for the time of the Vessel required therefor at the rate of Charter Hire (computed on a per diem basis) provided for in this Charter and other expenses incidental to such work.[6]

The section on maintenance of the tugboat, section 6, states:

Charterer always at its own expense, procurement and risk, shall have full responsibility for possession, maintenance and repair of the Vessel throughout the Charter Period, and at its expense and for its account (whether or not any applicable insurance proceeds are adequate for the purpose) will (i) maintain and preserve the Vessel and her equipment in good condi-

tion, running order or repair, so that the Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, appareled, furnished, equipped and in every respect seaworthy and in good operating condition, (ii) keep the Vessel in such condition as will entitle her to the highest classification and rating from the American Bureau of Shipping for vessels of the same class, age and type, and furnish to Shipowner upon request photostatic copies of all certificates issued by the American Bureau of Shipping evidencing the maintenance of such classification and all reports of such Bureau with respect to annual or other periodic or damage surveys, (iii) cause the Vessel to meet all safety, operational and maintenance requirements of the United States Coast Guard and any other United States, international or other authority having jurisdiction over the Vessel and (iv) cause the Vessel to be overhauled when necessary and to be drydocked, cleaned and bottom-painted when necessary, but at least as frequently as may be required to maintain such classification. All maintenance and repair of the Vessel performed for the purpose of meeting the requirements of the American Bureau of Shipping, including changes in or additions to such requirements, shall be for Charterer's account.[7]

The parties included a separate warranty by Dow for the gearboxes by which Dow warranted the condition of the gearboxes and promised to cover any costs of repair.

The charter party for the barge contains a section on redelivery that states:

Charterer shall redeliver the Vessel at the time of the expiration of the Term, except that the Term shall be extended for the duration of any voyage of the Vessel in progress at such time of expiration and for such additional time as shall be required to effect redelivery; and Charterer will pay Hire for the period of such extension at a daily rate proportionate to the monthly Hire. Charterer shall make such redeliv-

---

6. Plaintiff's Ex. 2 at 24–25.       7. *Id.* at 5–6.

ery of the Vessel to Owner at any safe United States Gulf of Mexico port or United States East Coast Port, at Charterer's option, and Charterer shall notify Owner at least ninety (90) days in advance of such approximate time of redelivery. Charterer agrees that at the time of such redelivery the Vessel shall be free and clear of all liens, charges and encumbrances ... and shall be in the same good order and condition as when delivered hereunder, ordinary wear and tear alone excepted. If there should be redelivery on account of the occurrence of an event of default hereunder, Charterer shall, at the request of Owner and at Charterer's expense have the Vessel surveyed by a qualified marine surveyor.[8]

The barge charter's maintenance section states:

(a) From and after the Delivery Date of the Vessel and delivery thereof of Charterer, Charterer, always at its own expense, procurement and risk, shall have exclusive control of the Vessel and shall be charged with full responsibility for its possession, maintenance and repair, use and operation throughout the Term. Charterer shall at all times maintain and preserve the Vessel in accordance with good commercial maintenance practice, shall keep the Vessel in such condition as will entitle her to maintain the classification and rating of the American Bureau of Shipping as exists on the Delivery Date for vessels of the same age and type and shall furnish to Owner photostatic copies of all certificates issued by the American Bureau of Shipping evidencing the maintenance of such classification. The Vessel shall, and Charterer covenants that it will, at all times, comply with all applicable laws, treaties and conventions, and rules and regulations issued thereunder, and shall have on board, when required thereby, valid certificates showing compliance therewith.

(b) The Vessel and its equipment shall be repaired and overhauled by Charterer at its expense, whenever necessary. The Vessel shall likewise be drydocked, cleaned and bottom painted by Charterer at its expense, whenever necessary, but in any event at least as often as may be required by the American Bureau of Shipping during the Term for maintenance of the classification referred in paragraph (a) of this Article 5. Charterer will comply as required with all recommendations resulting from each special survey of the Vessel made under the rules of the American Bureau of Shipping. Charterer shall, at its expense, furnish owner with written information as to any casualty involving any loss or damage to the Vessel in excess of $100,000 and all survey reports in connection therewith.

(c) At pre-delivery drydocking, hydroblasting of the hull for inspection of the Vessel to be at Owner's cost. At predelivery drydocking, Owner shall paint the hull of the Vessel at Owner's cost. Upon redelivery of the Vessel, Charterer shall paint the hull at Charterer's cost. However, shall Charterer keep the Vessel for more than three years, Charterer shall be required to touch up the hull for up to three years, then repaint the hull upon redelivery.

(d) Owner and its authorized representatives may at any time, upon reasonable notice, and at its own expense, inspect the Vessel at drydocking or otherwise and inspect the Vessel's log, but Owner shall have no duty to do so.[9]

In January 1988, Dow delivered the vessels to Alabama Drydock & Shipbuilding Company in Mobile, Alabama to begin the charter period, and pursuant to an agreement between the parties ABS Worldwide Technical Services, Inc. ("ABSTECH") conducted a joint on-hire survey of the vessels.[10] The purpose of the survey was to allow Dow and Texaco to inspect the vessel conditions simultaneously and record any existing defects to the vessels. The shipyard made repairs to the vessels pursuant to Texaco's request, and Texaco took the vessels under the charter. Upon taking possession of the

8. Plaintiff's Ex. 1 at 2–3.

9. *Id.* at 5–6.

10. *See* Plaintiff's Ex. 5.

vessels under the charter party, Texaco renamed the tugboat the STAR PROVIDENCE and the barge the STAR 810.

Texaco attempted to sail the vessels from the shipyard to its facility in Port Arthur, Texas, but problems in one of the tugboat's gearboxes forced the vessels into the shipyard for further repairs. After the repair period during which Dow did not receive charter payments, Texaco began its operations with the vessels in March 1988. In the two years of the initial charter party, Texaco brought the vessels to a shipyard for repairs to both the tugboat and the barge. The barge repairs included work upon cracks between the cargo and ballast tanks. In late 1989, the two parties negotiated an extension of the lease of the vessels. A former employee of Texaco testified that changes in federal regulations made the use of double-hulled vessels more attractive, and Texaco believed that its money invested in the repair of the vessels would be recouped through their continued operation.

On December 12, 1989, Dow and Texaco executed an addendum to the charter party by which the parties agreed to extend the charter through March 4, 1993.[11] The parties also negotiated the costs for repairs and modifications to the vessels. Dow agreed to remove the storage tanks from the deck of the barge and reimburse Texaco for the cost of removal. Texaco agreed to replace wasted steel in the ballast tanks of the barge, place a protective coating on the new steel, and install a vapor recovery system and a closed gauging system at its own expense. The addendum also provided that Texaco would have an option to purchase the vessels at the conclusion of the charter period.

During the extended period of the charter, Texaco continued to encounter problems in the operation of the tugboat and the barge.

Cracks developed in the barge between the cargo and ballast tanks and steel continued to corrode, requiring Texaco to replace and reinforce sections of the steel structure and apply a second protective coating. On the tugboat Texaco made repairs to the gearboxes, the kort nozzles and Bludworth locking system. Texaco witnesses testified that the tugboat was drydocked five times during the five-year period of the charter, rather than the anticipated two drydockings over the period.

On July 2, 1992, Dixie Carriers, Inc. ("Dixie") bought the tugboat and the barge from the corporations that had financed the construction of the vessels.[12] Dow consented to the assignment of the bareboat charter to Dixie and to continue its obligations under the charter. Under the terms of the agreement, Dow would deliver the vessels to Dixie following Texaco's redelivery to Dow. At no time was there any contractual relationship between Texaco and Dixie.

Texaco brought the vessels to Colonna's Shipyard in Norfolk, Virginia in January 1993 for necessary repairs in anticipation of the redelivery date of March 5, 1993. During this period Dow first appointed Gleneagle Ship Management Company ("Gleneagle"), Dow's former vessel manager, as its agent for purposes of redelivery. Shortly thereafter Dow appointed Dixie in the same capacity without modifying Gleneagle's status. Witnesses testified at trial that Dow requested Gleneagle to serve as agent in addition to Dixie based on concern voiced by Texaco to Dow over the presence of Dixie at Colonna's Shipyard. During the period when the vessels were at the shipyard, a dispute arose over access to the vessels. Dixie and Gleneagle employees testified that when they attempted to board the vessels on January 26, 1993, they were denied access by Texaco employees.[13]

11. See Plaintiff's Exs. 1 & 2 (Addendum No. 3 dated Dec. 12, 1989).

12. A third-party corporation bought the tugboat and the barge from the financing companies on February 24, 1992. See Defendant's Ex. 65. Dixie purchased the vessels from the third-party corporation on July 2, 1992, and under the agreement, the third-party corporation assigned

its rights under the bareboat charters for the tugboat and the barge to Dixie. Id.

13. On January 21, 1993, prior to Texaco's denial of access to representatives of Dow and Gleneagle, counsel for Dixie wrote to Texaco addressing the denial of access and requesting that representatives of Dixie and Dow be present and participate in any redelivery surveys. See Defen-

On February 23, 1993, three Dow and Dixie representatives spent approximately ten hours inspecting the barge in drydock. A Dow representative testified that he entered the number one port ballast tank and found the upper wing portion of the tank dirty and covered with a layer of mud. The Dow representative also stated that the tank surface had excessive scale, or rust, on its steel members and certain sections had excessive deterioration due to wastage. The three representatives testified that at approximately 5 p.m. a Texaco employee informed them that they would be required to cease their inspection and leave the vessel. Dow and Dixie claim they had received no prior notice of time restrictions on their inspection, but Texaco claims otherwise. A Dow representative made a further inspection of the vessel on March 1, 1993.

Texaco redelivered the tugboat and the barge to Dow on March 5, 1993 at Colonna's Shipyards. At the time of redelivery the tugboat had been credited with all necessary ABS surveys, but required inspection for its load line certificate. The barge required necessary surveys for its ABS classification as well as for its load line certificate. Both vessels carried ABS certification at the time of redelivery. Representatives of Dow, Dixie and Texaco attended a joint off-hire survey of the tugboat and the barge. Prior to redelivery, Dixie notified the ABS of the upcoming classification survey of the barge, and witnesses testified that Dixie pressured the ABS to assign a senior surveyor based on Dixie's concern for the condition of the barge.[14] The initial ABS surveyor was Hugh Hancock, the most senior surveyor in the Newport News division. He conducted a survey of the barge during which he noted the overall condition of the vessel and any

repairs required for certification.[15] The surveyor inspected the ballast and cargo tanks and found only one ballast tank that contained wasted steel which required replacement. Hancock concluded that the vessel met all classifications requirements and issued a provisional load line certificate.

Witnesses testified that Dixie was not satisfied with Hancock's survey of the barge for ABS and hired the marine surveying firm Stickney, Dufour & Associates ("Stickney, Dufour") to resurvey the barge. On March 9, 1993, a Stickney, Dufour employee inspected the barge and recorded eighty-four defective items, including deteriorated steel members in the ballast tanks.[16] Representatives of Dow, Dixie and Texaco were present during the inspection. Based, in part, on the deficiencies found by the Stickney, Dufour surveyor, Dixie petitioned the ABS in Norfolk to resurvey the barge. When the ABS surveyor Hancock allegedly refused, Dixie contacted the survey manager for the ABS and made a similar request. The survey manager consented to the resurvey and assigned a different surveyor, William James, to conduct the resurvey.

On March 19, 1993, James inspected the barge at Colonna's Shipyard. James made a brief inspection of one of the ballast tanks and informed a Dixie representative that based on his findings of substandard steel members in the ballast tank, the ABS would revoke the barge's classification rating. On March 22, 1993, James continued his inspection of the vessel during which he marked steel members of the ballast tank which he opined were wasted, thinned or suspect. James stated that his findings were recommendations and that the vessel would not lose its class certification.[17] In his report

dant's Ex. 39 (letter from Garney Griggs to Patricia Deer dated Jan. 21, 1993).

**14.** *See* Plaintiff's Ex. 30 (letter from Kenneth Bush to Joseph Abschneider dated Feb. 9, 1993).

**15.** *See* Plaintiff's Exs. 37 & 38.

**16.** *See* Plaintiff's Ex. 48 (Stickney, Dufour & Associates Survey Report dated Mar. 17, 1993).

**17.** Dixie and the ABS disagreed over the nature of the ABS survey and the effective date of revo-

cation of the load line certificate. On March 16, 1993, Dixie wrote to the ABS and stated that it considered the ABS survey a continuation of the special survey necessary for classification. Dixie further claimed that because the condition of the barge had not changed since the initial survey date, the load line certificate should be withdrawn as of March 5, 1993. On March 25, 1993, the ABS survey manager informed Dixie that the ABS was conducting a "condition survey," as opposed to a "special survey," on the barge, and that the ABS would rescind the provisional load line certificate issued for the barge pending the

dated March 31, 1993, James noted that "[t]he combination Wing and Double Bottom Ballast Tanks were cleaned of reported protective coatings including scale and mud residue, internally examined and the internal structure was found wasted, thinned, or suspect."[18] Multiple bays in the ballast tanks inspected contained steel members that James found to have deteriorated below acceptable standards. The report concluded:

> 18. A recommendation was made by the undersigned Surveyors to the on-site Owner's Representative, that all 'suspect' internal structure noted in the above Condition Survey Report be thickness gauged to confirm Rule scantling compliance.
>
> No thickness gaugings were taken at this time, as Owners advise they will stage the ballast tanks for gaugings and repairs.
>
> 19. The above deficiencies noted in Items 1 thru 17 of this report, are to be either part cropped and renewed, or verified as in compliance to the required scantlings prior to the barge returning to active service.[19]

On April 22, 1993, Dixie wrote to the ABS to appeal its decision that the special survey was complete and that the load line certificate would be rescinded for the barge as of March 25, 1993. Dixie stated that it advised the ABS that substandard conditions existed on the tugboat and the barge prior to redelivery and that such conditions should have prevented recertification. Dixie stated:

> Dixie disagrees with the actions or inactions of the ABS and requests that the ABS reconsider its actions relating to the STAR 810. Specifically, Dixie requests that the ABS not deem the Special Survey

No. 3, Annual Survey and Annual Load Line Inspection complete as of March 5, 1993, but, instead, reopen or hold pending such surveys and inspection as of March 5, 1993, until completion of the repairs noted in the "condition surveys", which "condition surveys" should be withdrawn and considered by the ABS as a part and continuation of the Special Survey No. 3, Annual Survey and Annual Load [sic] Inspection. In that context, Dixie requests that if the STAR 810 shall be retained as classed by the ABS as of March 5, 1993, its classifications should be subject to the outstanding recommendations of the "condition surveys" and that the Special Survey No. 3, Annual Survey and Annual Load Line Inspection shall not be complete until the outstanding recommendations have been dealt with. If deemed necessary by the Rules of the ABS, the ABS may appoint a Surveyor to undertake a special survey to consider this appeal and disagreement.[20]

In response to the ABS survey and its recommendations, Dixie began to measure the thickness of suspect steel members of one of the ballast tanks through a process known as audiogauging. Audiogauging involves the measurement of a steel member's thickness by a surveyor employing an electronic device. The surveyor then submits the readings from the device to the ABS office in New Orleans, Louisiana, where the measurements are compared to records on acceptable thicknesses of steel for each registered vessel. The survey of the barge revealed that virtually all of the steel members marked in the tank during James' second

---

completion of the survey. On March 26, 1993, the ABS replied to Dixie's March 16th letter and stated that it considered the special survey of March 5th to be completed and that the load line certificate for the barge would be rescinded as of March 25th.

**18.** Plaintiff's Ex. 46 (ABS Survey of Barge STAR 810 dated Mar. 31, 1993).

**19.** *Id.* at 19. On April 2, 1993, the ABS issued a further survey of the barge relating to the condition of the cargo tanks. *See* Plaintiff's Ex. 48. In the survey the ABS repeats the requirement that "[t]he deficiencies noted in … this report

are to be repaired prior to the barge returning to active service." *Id.*

**20.** Plaintiff's Ex. 48 at 5 (letter from Dixie to the ABS dated Apr. 22, 1993). On August 26, 1993, the ABS replied to Dixie's request for a special survey on the barge. The ABS noted that based on Dixie's appeal and request for a special survey, the ABS had not acted on the original surveyor's recommendation to keep the barge in class because the surveys were not credited to the vessel. However, the ABS had not removed the barge from class because the ABS committee has exclusive authority to remove a vessel from class. Plaintiff's Ex. 58 (letter from the ABS to

ABS survey did not meet minimum ABS requirements. Witnesses testified that rather than continue the expensive audiogauging process, Dixie decided to replace all suspect members that had been marked by the second ABS surveyor.

On April 6, 1993, the ABS commenced a condition survey on the tugboat pursuant to Dixie's request. The tugboat was placed in drydock and cleaned, and the ABS surveyor undertook his survey. On April 9, 1993, the ABS surveyor filed his report on the tugboat's condition wherein he cited certain deficiencies which he recommended be repaired.[21] Dixie subsequently had the tugboat repaired, and on May 3, 1993, the ABS found that the tugboat met ABS standards.

In April 1993, Dow and Dixie began negotiations upon Dixie's claim for reimbursement of repairs to the tugboat and barge allegedly required to meet the provisions of Dow's charter with Dixie. On May 17, 1993, a memorandum was produced stating that Dow would pay $963,108.00 to settle its claims with Dixie. The memorandum, signed only by Terry Walker for Dow, divided the total into repair costs for the tugboat and the barge.[22] Neither this memorandum nor the breakdown of the figures therein were incorporated into the formal settlement agreement. The total repair cost for each vessel was further divided into categories, as the barge had repair costs for "steel," "drydocking," "ballast tank cleaning," "electrical," "hull coating," and "miscellaneous." The

memorandum did not reflect the final cost of repairs to the tugboat and the barge; rather, it contained estimated costs for each repair item. On June 28, 1993; Dow and Dixie executed a settlement agreement in which Dixie agreed to accept Dow's payment in return for Dixie's release of all claims against Dow relating to the tugboat and the barge.[23]

During the period after redelivery of the vessel until early August 1993, Dixie kept the tugboat and the barge at Colonna's Shipyard for repairs. Colonna's Shipyard carried out the repairs at the direction of Dixie, and submitted a series of bills during the repair period.[24] Some of the repairs to the barge were necessary to maintain ABS classification requirements, while others to the barge and the tugboat were done to meet Dixie's own specifications for the vessels. The total repair cost for the tugboat and the barge was $1,468,053.24.[25]

On May 9, 1994, Dow filed a complaint in this Court against Texaco. Dow claimed jurisdiction pursuant to 28 U.S.C. § 1333(1) as an admiralty or maritime claim. In its complaint, Dow alleged four counts against Texaco. In Count I, Dow alleges that Texaco breached its obligations under the agreement by failing to maintain and preserve the tugboat SEA SKIMMER in accordance with good commercial maintenance practice, failed to maintain the vessel in a condition to maintain the classification and rating of the ABS, failed to return the vessel in a similar condition as when delivered, and refused to allow

Dixie dated Aug. 26, 1993); *see also id.* (letter from the ABS to Dixie dated Oct. 22, 1993).

**21.** Plaintiff's Ex. 53 at 1 (ABS Condition Survey of Tugboat STAR PROVIDENCE dated Apr. 9, 1993).

**22.** Defendant's Ex. 648 (memorandum dated May 17, 1993).

**23.** Plaintiff's Ex. 74. The agreement states that "Dow will pay to Dixie the sum of NINE HUNDRED SIXTY–THREE THOUSAND ONE HUNDRED EIGHT AND NO/100 DOLLARS ($963,-108.00). Such payment shall be in three equal installments of THREE HUNDRED TWENTY–ONE THOUSAND THIRTY–SIX AND NO/100 DOLLARS ($321,036.00)." *Id.* at 6. The agreement does not incorporate the May 17th memorandum categorizing the repairs to the tugboat and the barge, nor does the agreement prorate portions of the total payment for the tugboat or

the barge or categorize particular repairs made to either vessel.

**24.** *See* Plaintiff's Exs. 71–73; Defendant's Exs. 597–98.

**25.** This figure reflects the total amount for invoices submitted to Dixie by Colonna Shipyards. At trial, Dow presented evidence of that portion of those costs allegedly chargeable to Texaco from the Colonna's Shipyard invoices. Two witnesses for Dow prepared charts detailing the expenses it claimed should be assigned to Texaco. *See* Defendant's Ex. 597A (Kenneth Bush chart outlining repairs and costs for Tugboat SEA SKIMMER); Defendant's Ex. 598A (Kenneth Bush chart outlining repairs and costs for Barge PLAQUEMINE); Defendant's Ex. 660 (Rick Van Hemmen chart outlining repairs and costs for Tugboat SEA SKIMMER); Defendant's Ex. 661 (Rick Van Hemmen chart outlining repairs and costs for Barge SEA SKIMMER).

the plaintiff to inspect the vessel. In Count II, Dow alleged that as a result of Texaco's breach, Dow was unable to deliver the SEA SKIMMER to her owner, Dixie, in the condition required by Dow's charter party with Dixie. Dow claimed that it was forced to make necessary repairs to the tugboat and pay insurance and charter costs. In Count III, Dow alleged that Texaco breached its obligation under the agreement by failing to maintain and preserve the barge PLAQUE-MINE in accordance with good commercial maintenance practice, failed to maintain the vessel in a condition to maintain the classification and rating of the ABS, failed to return the vessel in a similar condition as when delivered, and refused to allow the plaintiff to inspect the vessel. In Count IV, Dow alleged that as a result of Texaco's breach, Dow was unable to deliver the PLAQUE-MINE to Dixie in the condition required by Dow's charter party with Dixie. Dow claimed that it was forced to reimburse Dixie for the costs of repairs to the tugboat and the barge and pay insurance and charter costs. Dow sought indemnity for the monies it had paid to Dixie, as well as attorney's fees, interest as provided under the charter party, and pre-judgment interests and costs.

On June 15, 1994, defendant Texaco filed an answer and affirmative defenses. Texaco denied the plaintiff's allegations, and asserted that it did not breach any duties owed to the plaintiff. The defendant further alleged that Dow did not sustain any damages claimed in its complaint and that Texaco fulfilled all contractual obligations. Texaco stated a counterclaim in which it alleged that in preparation for redelivery of the vessels inspections were carried out to verify the vessels' condition, and that Dow interfered with these inspections. Texaco claims that the interference caused Texaco additional expenses, and that Dow refused redelivery of the vessels. Texaco sought compensatory damages as well as attorney's fees and costs.[26]

The foregoing is intended as an overview of this factually intensive proceeding. Spe-

cific factual findings relevant to the Court's opinion are discussed herein where appropriate.

## II.  STANDARD OF REVIEW

### A.  Bareboat Charter Party

Under a bareboat or demise charter, full possession and control of the chartered vessel is turned over to the charterer. *Reed v. S.S. Yaka,* 373 U.S. 410, 412, 83 S.Ct. 1349, 1351, 10 L.Ed.2d 448 (1963) ("It has long been recognized in the law of admiralty that for many, if not most purposes the bareboat charterer is to be treated as the owner, generally called the owner *pro hac vice.*"); Alex L. Parks & Edward V. Cattell, Jr., *The Law of Tug, Tow & Pilotage* 875 (3d ed. 1994). The United States Court of Appeals for the Fourth Circuit has stated:

> This rule recognizes that when the owner of the vessel enters into a demise charter, he surrenders all possession and control of the vessel to the charterer. Since he no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities of its ownership. Conversely, the demise charterer "becomes subject to the duties and responsibilities of ownership."

*Kerr–McGee Corp. v. Law,* 479 F.2d 61, 63 (4th Cir.1973) (quoting *Leary v. United States,* 81 U.S. (14 Wall.) 607, 610, 20 L.Ed. 756 (1872)). As a bareboat charterer, the charterer is held to be a bailee of the vessel. *Richmond Sand & Gravel Corp. v. Tidewater Constr. Corp.,* 170 F.2d 392, 393 (4th Cir. 1948); 2B *Benedict on Admiralty* § 51, at 3–3 (1995). "A charter party is a maritime contract, governed exclusively by federal maritime law and not to be litigated under the common law or statutory law of a state, as to do so would defeat uniformity." Parks & Cattell, *supra,* at 875; *see also Jack Neilson, Inc. v. Tug Peggy,* 428 F.2d 54, 55 (5th Cir.1970), *cert. denied,* 401 U.S. 955, 91 S.Ct. 973, 28 L.Ed.2d 238 (1971).

The owner of a chartered vessel impliedly warrants the seaworthiness of the

---

**26.** Dow filed an answer to Texaco's counterclaim on July 1, 1994 in which it denied the defen-    dant's allegations.

vessel. *Dempsey v. Downing*, 11 F.2d 15, 17 (4th Cir.1926). Ordinarily, the charterer, as bailee of the vessel, is responsible for any damage to the vessel caused by his negligence, except for ordinary wear and tear. *Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946); 2B *Benedict on Admiralty* § 51, at 3–3. Under the bailment contract a presumption of negligence by the bailee arises from proof by the owner of the vessel that the vessel was delivered to the bailee in good condition and was returned in damaged condition. *Richmond Sand & Gravel*, 170 F.2d at 393. Such a presumption is rebuttable and shifts the burden of going forward with the evidence to the bailee. *Id.* The United States Supreme Court has stated that a court may draw an inference where the bailee fails to rebut the presumption:

> Whether we label this permissible inference with the equivocal term "presumption" or consider merely that it is a rational inference from the facts proven, it does no more than require the bailee, if he would avoid the inference, to go forward with evidence sufficient to persuade that the non-existence of the fact, which would otherwise be inferred, is as probable as its existence. It does not cause the burden of proof to shift, and if the bailee does go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start.

*Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 111, 62 S.Ct. 156, 161, 86 L.Ed. 89 (1941) (citations omitted); *see also* 2B *Benedict on Admiralty* § 51, at 3–4 to 3–6 ("The burden is then upon the charterer to establish that he discharged his duty to exercise reasonable care or that liability lies with the owner or others."); *cf. Richmond Sand & Gravel*, 170 F.2d at 393–94 (explaining the manner in which a bailee may rebut the presumption where a vessel is damaged through an accident).

■ The parties to a bareboat charter may modify their traditional maritime rights and liabilities as bailor and bailee by including specific provisions in the charter party. In *Sun Printing & Publishing Ass'n v. Moore*, 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366 (1902), the United States Supreme Court considered a charter party for a yacht in which the charterer expressly promised to return the vessel in a particular condition. The charter party required the charterer to keep "said yacht in repair and pay all its running expenses, and to surrender said yacht with all its gear, furniture and tackle at the expiration of this contract to the owner or his agent ... in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted." *Id.* at 655, 22 S.Ct. at 246. The charter further stated that the charterer "shall be liable and responsible for any and all loss and damage to hull, machinery, equipment, tackle, spars, furniture or the like." *Id.* The Supreme Court noted the general obligation of a bailee under a bailment contract, and stated that " [a] bailee may, however, enlarge his legal responsibility by contract, *express or fairly implied,* and render himself liable for the loss or destruction of the goods committed to his care—the bailment or compensation to be received therefor being a sufficient consideration for such an undertaking.' " *Id.* at 654, 22 S.Ct. at 245 (quoting *Sturm v. Boker*, 150 U.S. 312, 330, 14 S.Ct. 99, 104–05, 37 L.Ed. 1093 (1893)). The Court concluded that the charterer, by agreeing to the language in the charter party making him liable for any loss to the vessel, had expanded his duties under the bailment contract:

> ... [I]t is difficult to conceive how language could more aptly express the absolute obligation, not only to repair and keep in good order to the end of the hiring and to return, but, moreover, to be responsible for any and all loss and damage to the vessel, her fixtures and appointments. These stipulations seem to us to leave no doubt of the absolute liability to return; in other words, of the putting of the risk of damage or loss of the vessel upon the hirer.... [H]aving provided for all repairs, having stipulated absolutely for the return of the vessel in full repair, having put the risk of any and all loss on the hirer, the contract then in express terms

fixes the value of the vessel, and makes provision for security to protect against any and all loss or damage sustained by a failure of the hirer to fulfill each and all of the positive obligations which the contract imposed.

*Id.* at 656, 22 S.Ct. at 246.

In *Newport News Shipbuilding & Dry Dock Co. v. United States,* 34 F.2d 100 (4th Cir.), *cert. denied,* 280 U.S. 599, 50 S.Ct. 69, 74 L.Ed. 645 (1929), the Fourth Circuit addressed the ability of parties to a bailment contract to modify their rights. The United States owned a steamship to which it wished to have repairs made, and contracted with the shipyard to carry out the repairs. The parties' contract contained a provision under which the United States as owner agreed to carry insurance in the amount of $2,000,000 for "hull, machinery and equipment" for a reduced contract price. *Id.* at 101–02. The court examined the contract and stated:

A careful examination of the circumstances leading up to and surrounding the making of the contract must lead to the conclusion that it was intended by the parties that the United States assumed, by the insurance clause, the risk of loss by fire up to the amount of $2,000,000, and that this assumption of risk was not only for the benefit of the United States, but for the benefit of the shipbuilder also. To hold otherwise would be to hold that the agreement on the part of the United States to carry the "present hull, machinery and equipment insurance," had absolutely no meaning whatever, and was of no value to the shipyard.

*Id.* at 106. The court assessed the ability of parties to a bailment contract to alter their rights, and quoted the Supreme Court in *Santa Fe, Prescott & Phoenix Railway Co. v. Grant Brothers Construction Co.,* 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787 (1913), in which the Court stated:

The parties, then, were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies the effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agree-

ment, the highest public policy is found in the enforcement of the contract which was actually made.

*Id.* at 188, 33 S.Ct. at 478 (*quoted in Newport News Shipbuilding,* 34 F.2d at 107). Although the Fourth Circuit found the shipyard liable for its negligence in causing the fire damage, it concluded that the United States accepted the benefit of a lower contract cost by assuming a portion of the liability under the insurance agreement. *Newport News Shipbuilding,* 34 F.2d at 106.

### B. Ordinary Wear and Tear

The bareboat charter party allows for normal wear and tear to a vessel during the period of the agreement. One commentator has noted:

Applying general legal principles, it would appear that the phrase "reasonable wear and tear" would include damage to a vessel due to the gradual deterioration which results from use, lapse of time, and the operation of the elements. In determining the obligation imposed, it must be considered with reference to the use to which the vessel is to be put and the business to be carried on. Certainly, the risk of extraordinary hazards inherent in the tasks imposed by the charterer rests upon the charterer.

Alex L. Parks & Edward V. Cattell, Jr., *The Law of Tug, Tow & Pilotage* 902 (3d ed. 1994) (citing *The Ruth,* 20 F.2d 314 (3d Cir. 1927)). In *Moran Towing Corp. v. M.A. Gammino Construction Co.,* 363 F.2d 108 (1st Cir.1966), the United States Court of Appeals for the First Circuit considered the application of "wear and tear" to a charter party in which the bailor assumed liability for ordinary wear and tear and the charterer was responsible for any damage caused by the negligent loading of material. The court stated that

[w]ear and tear means normal depreciation. No doubt what is "normal" must be responsive to practices in the service for which the vessel is intended. In this case, the contract expressly tied wear and tear in with "the nature of the material to be transported." It did not, however, tie it in with contacts by the skip box, even if, in

one sense, rough handling might have been anticipated, unless by the nature of things such contacts were unavoidable. The effects of negligence are not wear and tear, and they do not become wear and tear merely because they may be anticipated. *Id.* at 114 (citations omitted). In *Otto Candies, Inc. v. McDermott International, Inc.,* 600 F.Supp. 1334 (E.D.La.1985), *aff'd,* 785 F.2d 1033 (5th Cir.1986), the court considered the construction of the contract term "ordinary wear and tear." The court stated:

The usual and ordinary meaning ascribed to the phrase "wear and tear" is that deterioration of condition or depreciation in value attributable to normal and reasonable use of an object. What is normal and reasonable use depends upon the service for which the object is intended. Other factors useful in defining normal wear and tear include the age of the object and any applicable guidelines or practices in the particular industry.

*Id.* at 1343 (citations omitted). The court further noted that "neither ABS nor the Coast Guard require conditions attributable to ordinary wear and tear to be repaired in order for a barge to be classified and certified for ocean-going service. Structural damage, on the other hand, is not considered wear and tear and must be repaired in order for a vessel to be certified for ocean-going service." *Id.; see also Cyclops Corp. v. Home Ins. Co.,* 352 F.Supp. 931, 936 (W.D.Pa.1973) (stating that "the words 'wear and tear' mean simply and solely that ordinary and natural deterioration or abrasion which an object experiences by its expected contacts between its component parts and outside objects during the period of its natural life expectancy").

### III. FINDINGS

#### A. Duties Arising by Virtue of the Bareboat Charter

1. *Traditional Duties Under a Maritime Bailment*

◼ Dow seeks damages from Texaco arising from the charter of the tugboat and the barge based on Texaco's violation of certain provisions of the charter party. Dow asserts that the charter party established contractual duties for both parties and that Texaco's breach of those duties is governed by the law of contracts.[27] Texaco counters that any breach of the charter party is controlled by the bailment relationship established between the parties, and recovery for the alleged damages to the vessels are measured by the maritime law of bailments.[28] Texaco argues that Dow bears the burden of proving that Texaco failed to redeliver the vessels in the same condition as Dow delivered them with ordinary wear and tear excepted.[29]

◼ The Court FINDS that the maritime law of bailments and the contractual obligations of the charter party combine to constitute the standards by which Texaco was required to operate, maintain and redeliver the tugboat and barge. The delivery of the tugboat and the barge by Dow to Texaco pursuant to the respective charter parties created a bailment relationship under the traditional maritime law of bailments. The Court FINDS that under the maritime law of bailments, Dow has failed to prove a cause of action against Texaco. In the present action, Dow established a prima facie case by demonstrating that it delivered the tugboat and the barge to Texaco in good condition and that Texaco redelivered the vessels in a lesser condition. Texaco has come forward with evidence under the bailment standard and persuaded the Court that it is equally probable as not that it exercised reasonable care in maintaining the vessels throughout the duration of the charter party. Texaco having rebutted the presumption of negligence, the ultimate burden of proving that the required repairs to the vessels were due to Texaco's negligence rests with Dow. The Court FINDS that Dow has failed to establish through its evidence that Texaco was negligent in the performance of its duties as the

---

**27.** Plaintiff's Proposed Conclusions of Law at ¶¶ 1–2.

**28.** Defendant's Proposed Conclusions of Law at ¶¶ 2–3.

**29.** *Id.* at ¶ 6.

bailee of the tugboat and the barge. *Commercial Molasses Corp.*, 314 U.S. at 111, 62 S.Ct. at 161. Texaco presented evidence that it maintained a continuous schedule of maintenance to both vessels during the charter parties and drydocked the vessels when repairs became necessary. Texaco experienced many of the same maintenance problems that Dow encountered prior to 1988, and Texaco devoted time and resources to maintain the vessels in an operational condition, as Dow had done before the charter parties. As Dow's expert Rick Van Hemmen testified during trial, good commercial maintenance practices are measured by subjective criteria, and Dow was unable to demonstrate that Texaco acted negligently in operating the vessels during the charter parties.

### 2. Additional Contractual Duties Under the Dow–Texaco Charter Party

■ In addition to the traditional maritime duties arising by virtue of the bailment relationship between Dow and Texaco, the charter party for the tugboat and the barge created contractual obligations for both parties. Each charter party contains two distinct obligations assumed by the charterer: the duty of maintenance of the vessel and the duty to maintain the vessel in class. Dow and Texaco had the right to modify their traditional maritime duties in the charter party. *See Sun Printing*, 183 U.S. at 654, 22 S.Ct. at 245; *Newport News Shipbuilding*, 34 F.2d at 107. Texaco, as charterer of the vessels, assumed these two distinct contractual responsibilities, and therefore would be liable for their breach.

The two charter parties establish a duty of maintenance of the vessels upon the charterer. The charter party for the tugboat SEA SKIMMER states that the charterer will "maintain and preserve the Vessel and her equipment in good condition, running order

and repair, so that the Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, appareled, furnished, equipped and in every respect seaworthy and in good operating condition."[30] The charter party for the barge PLAQUEMINE states that "Charterer, always at its own expense, procurement and risk, shall have exclusive control of the Vessel and shall be charged with full responsibility for its possession, maintenance and repair, use and operation throughout the Term."[31] While the charter language differs, the two charter parties create similar obligations upon the charterer to engage in continual maintenance and repair of the vessels during the period of the charter party.

The second distinct obligation under the charter parties requires the charterer to ensure that the vessels are maintained in a condition that complies with ABS classification guidelines. Such an obligation is distinct from the requirement that the charterer comply with the ABS survey schedule and maintain the vessel's ABS classification.[32] The charter party for the tugboat SEA SKIMMER states that the charterer shall "keep the Vessel in such condition as will entitle her to the highest classification and rating from the American Bureau of Shipping for vessels of the same class, age and type."[33] The charter party for the barge PLAQUEMINE states that "Charterer ... shall keep the Vessel in such condition as will entitle her to maintain the classification and rating of the American Bureau of Shipping as exists on the Delivery Date for vessels of the same age and type."[34]

The Court FINDS that the charter parties required Texaco, as charterer of the tugboat and the barge, under two separate and distinct duties, firstly to maintain the vessels in the manner described, and secondly to maintain the vessels in a condition that would

---

**30.** Plaintiff's Ex. 2 at 5 (charter party for Tugboat SEA SKIMMER).

**31.** Plaintiff's Ex. 1 at 5 (charter party for Barge PLAQUEMINE).

**32.** *See* Plaintiff's Ex. 2 at 6 (charter agreement section 8, "Survey; Inspection"); Plaintiff's Ex. 1 at 6 (charter agreement section 5, "Maintenance of Classification, Repairs"). The charter

agreement for the barge states that "Charterer will comply as required with all recommendations resulting from each special survey of the Vessel made under the rules of the American Bureau of Shipping." *Id.*

**33.** Plaintiff's Ex. 2 at 5.

**34.** Plaintiff's Ex. 1 at 5.

entitle each to retain their ABS classifications. The two duties overlap in that Texaco's maintenance program for the vessels was aimed at satisfying the two contractual requirements; however, each duty had different criteria by which Texaco's performance is measured. The duty to maintain the vessels involves the general maintenance of the vessels and factors into its analysis the ordinary wear and tear of the vessels.[35] A review of a charterer's compliance with the duty to maintain the vessels includes examining whether the charterer undertook a course of regular maintenance to ensure that the vessels were maintained throughout the charter parties. The duty to maintain the vessels in a condition to allow retention of their ABS classification measures compliance by comparison with the independent standards of the American Bureau of Shipping. The charterer must ensure that at any point during the charter party, each component of the vessel that the ABS inspects for classification of the vessel must be in a condition to meet the ABS guidelines. Based on the two contractual duties of Texaco under the charter party and for the purpose of resolving Dow's complaint, the Court must consider Texaco's performance under the maintenance provisions and the condition of the vessels upon their redelivery to Dow.

## B. Repairs to the Vessels

### 1. Tugboat SEA SKIMMER

■ Prior to delivery of the tugboat to Texaco in 1988, ABSTECH conducted a survey of the vessel at which representatives of Dow and Texaco were present. The survey reviewed the general condition of the tugboat and noted any defects.[36] Two areas that the ABSTECH survey found required repair were the kort nozzles and the tailshafts.[37] After the necessary repairs were made, Texaco assumed control of the tugboat under the charter party. Witnesses testified at trial that Texaco experienced continual problems with the tugboat during the charter period, which included the kort nozzles and the tailshafts. Texaco drydocked the tugboat for repairs five times within the five-year period of the charter party, and complied with the ABS schedule of surveys. ABS classification guidelines required that the tugboat be drydocked within 36 months of redelivery. Texaco met this obligation,[38] and the tugboat was due only for its load line certificate at redelivery.

Dow has asserted that Texaco breached its obligations under the charter party for the tugboat by failing to maintain the vessel in the same condition as existed upon delivery and in failure to meet required ABS standards. At trial Texaco presented a chart summarizing repairs undertaken by Dixie at Colonna's Shipyard after redelivery of the tugboat.[39] The amount of repairs based on the Colonna's Shipyard invoices totalled $480,050.20. Many of the repairs summarized on the chart, however, represented items that Dixie chose to repair that were

---

35. Rick Van Hemmen, a private marine surveyor who testified for Dow, stated that ordinary wear and tear was distinguishable from wear and tear by what is required to be replaced by good commercial practice or because of the requirements of a special inspection. Mr. Van Hemmen stated that if an item was required to be replaced under ABS requirements, the condition of the item would not be attributed to ordinary wear and tear. Alyn Fife, a private marine surveyor who testified for Texaco, stated that ordinary wear and tear referred to normal occurrences during the operation of the vessel. Mr. Fife testified that if an item fell below ABS standards, its condition may nonetheless be attributed to ordinary wear and tear. The Court FINDS that because an item falls below prescribed ABS standards, it does *not* automatically follow that ordinary wear and tear is not the cause.

36. *See* Plaintiff's Ex. 5.

37. The report stated "[p]ort and stbd. fixed Kort nozzle bottom wrapper plating set in at forward end outboard of skeg. Welds on bottom plating where locally eroded and leaking were repaired at this time and made tight." *Id.* at 4. The report further stated "[t]he ringtype (Fedder) compression coupling on the port tailshaft connecting shaft to reduction gear stub shaft was slacked off, shaft shifted aft to allow adequate running clearance between propeller hub & rope guard and coupling made up in good order." *Id.*

38. The parties have disputed the date of transfer of the vessels upon Texaco's redelivery to Dow at Colonna's Shipyard. The Court FINDS that the transfer of the vessels occurred on March 5, 1993, in compliance with the charter agreement.

39. *See* Defendant's Ex. 597.

unrelated to any deficiencies alleged chargeable to Texaco.[40] The items allegedly chargeable to Texaco fell into three categories: kort nozzles repairs, tailshaft repairs, and drydocking expenses.[41]

Dow presented witness testimony and documentary evidence at trial to attempt to prove that the condition of the tugboat, particularly the kort nozzles and tailshafts, were severely deteriorated upon redelivery which constituted a breach of the charter party. Dow requested that the ABS conduct a condition survey on the tugboat, and April 9, 1993, the ABS filed a report outlining the vessel's condition.[42] The ABS surveyor found that the kort nozzles were wasted, holed and thinned, and both tailshafts contained deficiencies.[43] However, one of the ABS surveyors could not state whether the condition of the kort nozzles was caused by ordinary wear and tear. Other witnesses testified that the deterioration to the kort nozzles and tailshafts was the result of ordinary wear and tear. Terry Walker, Dow's former charter manager, testified that the kort nozzles routinely wore out from ordinary wear and tear prior to 1988. Paul Soper, a Dixie employee, testified that upon redelivery the tailshafts were worn but not excessively so. Kenneth Imondi, a Colonna's Shipyard employee, testified that the deterioration of the bearings in the tailshafts was due to ordinary wear and tear.

The Court FINDS that the condition of the kort nozzles and tailshafts of the tugboat upon redelivery was the result of ordinary wear and tear to the vessel. The design of the tugboat, a modified World War II-era vessel with two stern pieces welded together, employed engines that placed considerable strain on the vessel, particularly the kort nozzles. Dow repeatedly drydocked the tugboat prior to the Texaco charter to repair the kort nozzles and the tailshafts. During its charter, Texaco was also required to repair wasted components of the kort nozzles and tailshafts. It appears that at regular intervals during the operation of the tugboat it became necessary to drydock the vessel to repair these two components. The evidence presented at trial indicates that when Texaco redelivered the tugboat in March 1993, neither the kort nozzles nor the tailshafts were worn substantially beyond conditions previously observed. There is no evidence that either vessel was grounded, involved in a collision or otherwise damaged by outside means. Normal operation of the tugboat caused the kort nozzles and tailshafts to experience wear, and the evidence supports a conclusion that the condition upon redelivery was the result of normal operation and constituted ordinary wear and tear.[44] Accordingly, the Court FINDS that Texaco had the required ABS surveys conducted and did not breach its contractual obligation to maintain the tugboat during the charter party.

█ The Court further FINDS that Texaco did not breach its contractual duty to maintain the tugboat in the condition required to meet ABS classification guidelines. Although ABS surveyor James testified that the kort nozzles and tailshafts were below ABS standards, this uncorroborated conclusory statement was not supported by evidence presented at trial regarding applicable ABS standards by which to measure the condition of the kort nozzles or tailshafts. It should be noted that the tugboat, unlike the barge, was not constructed in accordance with ABS specifications or under ABS supervision and therefore did not qualify for the Maltese Cross designation. This circumstance may explain the lack of evidence of any ABS standards or specifications applicable to the tugboat. Even if there were ABS standards that gauged the condition of the

---

**40.** At trial Kenneth Bush, an employee of Dixie, reviewed the chart and marked those items which were chargeable to Texaco and those which were done at Dixie's discretion. Of the fifty-seven original items on the summary, Bush indicated that only fifteen could be charged to Texaco. *See* Defendant's Ex. 597A.

**41.** Defendant's Ex. 648.

**42.** Plaintiff's Ex. 53.

**43.** *Id.* at 1–4.

**44.** A June 1987 ABS survey of the tugboat described wastage to the kort nozzles as "wear-and-tear in service." Defendant's Ex. 288 at 3–4 (ABS Survey of Tugboat SEA SKIMMER dated June 5, 1987).

kort nozzles or tailshafts, Dow's evidence failed to prove that their condition would prevent the tugboat from retaining its ABS classification. Although ABS surveyor James noted the condition of the kort nozzles and the tailshafts, Lenny Pendexter, an ABS vice president, testified that at the time of redelivery both the port and starboard tailshafts were within ABS guidelines.[45] On May 3, 1993, the ABS issued a survey report for the tugboat in which it found ·that all components of the vessel, including the kort nozzles and the tailshafts, were in satisfactory condition. At no time following redelivery of the vessel did the ABS rescind the tugboat's classification rating or its load line certificate. No evidence was presented as to what ABS standards applied to the tugboat in general or the kort nozzles and tailshafts in particular.[46] No breach of its contractual obligations under the charter party having been proven and no liability under the maritime law of bailment having been established, the Court FINDS that Texaco is not liable for the repairs to the kort nozzles or the tailshafts and therefore not liable for the cost of drydocking or any other costs incurred by Dow for repairs to the tugboat.

### 2. Barge PLAQUEMINE

■ The ABSTECH survey conducted upon delivery of the vessels to Texaco in 1988 examined two tanks of the barge considered to be representative by Dow and Texaco. The report found that the number three starboard ballast tank contained "coating with general breakdown and considered ineffective with light to heavy scale on shell,

bulkheads and internals in areas of breakdown. One to two inches of mud in bilges and with mud on upper faces of longitudinal frames and stiffeners." [47] The report further noted that the top of the number four port cargo tank contained "general coating breakdown with areas of light to moderate scale including heating coils," while the bulkhead, underdeck and internals had "coating generally intact except for spot breakdown with areas of rust and/or light scale." [48] Texaco undertook the necessary repairs to replace damaged or deteriorated items.[49] During the period of the charter party, Texaco complied with the ABS survey requirements, and the ABS repeatedly recommended that the barge retain its classification.[50]

Dow has contended that Texaco breached its duty under the charter party through its alleged failure to return the barge in a condition similar to the condition upon delivery. Dow seeks indemnity for the monies paid Dixie for the repairs carried out upon the barge at Colonna's Shipyard subsequent to redelivery of the vessel. Like the repairs to the tugboat, a portion of the work done at Colonna's Shipyard to the barge is not claimed to have arisen from the care of the vessel by Texaco or relate to ABS classification guidelines, but was done at the discretion of Dixie.[51] Those repairs which were allegedly chargeable to Texaco's charter of the barge fall into seven categories: steel repairs, inspection costs, drydocking costs, ballast tank cleaning, electrical repairs, hull coating costs, and miscellaneous costs.[52]

Dow presented evidence at trial that documented the condition of the barge and the

45. Pendexter Dep. at 132–34.

46. It is noted that only an ABS committee has the authority to remove a vessel from class. Surveyor findings and recommendations may be a basis for committee action, but are not controlling in and of themselves.

47. Plaintiff's Ex. 5 at 6.

48. Id.

49. Patricia Deer, Texaco's former manager for its Northeast fleet, testified that Texaco spent one million dollars on steel repairs during the five-year period of the charter agreement.

50. See generally Defendant's Exs. 176–94 (ABS survey reports from Nov. 3, 1988 to Nov. 20,

1992). In compliance with ABS guidelines, ABS surveyors have the authority to make recommendations for repairs to the vessel's owner. See, e.g., Defendant's Ex. 186 (Steel Repair Survey dated July 12, 1990). The owner would then have one year within which to comply with the surveyor's recommendations. The issuance of recommendations by a surveyor, however, would not remove the classification of a vessel.

51. Defendant's Ex. 598A (summary of Dow's damage claims for Tugboat STAR PROVIDENCE).

52. See Defendant's Ex. 648.

extent of deterioration to its steel members. The initial ABS survey conducted after redelivery revealed only one ballast tank contained wasted steel, prompting Dixie to request the ABS to resurvey the barge. ABS surveyor James found more extensive evidence of wasted and corroded steel members during the resurvey and the ABS subsequently undertook to rescind the barge's load line certificate.[53] After initially audiogauging the suspect steel members marked by ABS surveyor James during the resurvey and finding all so marked deficient, Dixie decided to replace all suspect steel members in the tanks. An ABS survey dated July 16, 1993 found that all necessary repairs to the barge had been made, and the ABS issued a provisional load line certificate.[54]

The Court FINDS that the condition of the steel members or scantlings on the barge upon redelivery were the result of ordinary wear and tear to the vessel. Terry Walker, Dow's former charter manager, testified that he considered some wasting and thinning of steel to be normal wear and tear. Dow failed to prove at trial that the condition of the barge at redelivery was the result of any failure to maintain the vessel or failure to arrange ABS surveys by Texaco. Normal operations of the barge caused the deterioration of steel members of the barge ballast and cargo tanks, as well as other components of the barge, and the condition of the barge at redelivery resulted from ordinary wear and tear during Texaco's operation of the vessel. The Court FINDS that the ABS surveyor's findings that components of the barge were below ABS standards resulted from ordinary wear and tear. Accordingly, the Court FINDS that Texaco had the required ABS surveys conducted and did not

breach its contractual obligation to maintain the barge during the charter party.

■ The Court FINDS, however, that Texaco breached its contractual duty to maintain the barge in the condition required to meet ABS classification standards. The second ABS survey of the barge undertaken at the request of Dixie found that steel structural members in the tanks were "wasted, thinned or suspect," and issued recommendations for their repair.[55] The ABS survey concluded that "[t]he above deficiencies noted in Items 1 thru 17 or this report, are to be either part cropped and renewed, or verified as in compliance to the required scantlings prior to the barge returning to active service." [56] The original scantling requirements were filed with and approved by the ABS when the barge was constructed in accordance with ABS specifications and thereby earned its Maltese Cross designation. When presented in evidence the scantling specifications stood unchallenged as the applicable standard through which the barge was originally certified and which constituted the standard for continued certification. A subsequent condition survey completed in July 1993 noted that the barge owner had made all necessary repairs, concluded that all outstanding recommendations from the earlier ABS survey had been addressed and reinstated the barge's load line certificate.[57] Robert Bryant, the primary surveyor in the ABS' Newport News, Virginia office, testified that the barge would have been withdrawn from class had the recommended repairs not been made. Unlike the evidence regarding the tugboat, the evidence regarding the barge established the existence of applicable ABS standards and proof that failure to meet such standards would result in the loss of ABS classification. Further, and also unlike

53. *See* Plaintiff's Ex. 46 (ABS Survey of Barge STAR 810 dated Mar. 31, 1993); Defendant's Ex. 165 (letter from the ABS to Dixie dated Mar. 25, 1993 regarding rescission of STAR 810's load line certificate). Texaco claimed that this purported rescission was to no effect, since it asserted that only the Coast Guard had the authority to rescind the load line certificate.

54. *See* Defendant's Ex. 174 (ABS Survey of Barge STAR 810 dated July 16, 1993). The report stated that *"[i]t is recommended* that the *outstanding recommendations* noted in Newport

News, Va. Report No. NN5436 dated 31 March, 1993 and NN5451 dated 2 April, 1993, Item No. 2, be *considered dealt with." Id.* at 111.

55. Defendant's Ex. 567 (ABS Condition Survey of Barge STAR 810 dated Mar. 31, 1993).

56. *Id.* at 19.

57. Defendant's Ex. 574 (ABS Condition Survey of Barge STAR 810 dated July 16, 1993).

the evidence regarding the tugboat, Dow proved that the barge's load line certificate was temporarily ordered rescinded. Texaco's failure to maintain the barge in the condition required to meet the ABS classification guidelines resulted in a breach of the charter party, and the Court FINDS that Texaco is liable for the repair costs necessary for the barge to retain its entitlement to its ABS classification.

■ The Court further FINDS that Texaco is not liable for the full scope of the repairs undertaken for the barge. Kenneth Bush, a Dixie vice president, testified that many of the repairs made at Colonna's Shipyard between April and August 1993 were unrelated to the Texaco charter party and were done to the specifications of Dixie.[58] Those repairs for which Texaco may be held liable fall in one of the seven categories outlined in the May 17, 1993 memorandum.[59] Within the seven categories of costs, however, the Court FINDS that the evidence is insufficient to allow an award for each listed repair cost.

For the steel repair costs,[60] the Court FINDS that Texaco is liable for the costs for audiogauge readings, ballast tank internal steel repairs, overtime for ballast tank steel repairs, overtime for painting, No. 1 starboard cargo tank insert, No. 1 starboard cargo tank repairs, side shell repair supplies, and painting. The evidence clearly demonstrated that the steel members of the ballast tanks were in need of repair and were below ABS standards upon redelivery. The Court DECLINES to AWARD the claimed costs for the crane service and the air test, as Dow failed to present evidence that such services were employed exclusively to return the barge to ABS-class condition. For the inspection costs, the Court FINDS that Texaco is liable for the costs for ABS Condition Surveys # 361857145 and # 361857137. Both surveys were necessary to ensure that the barge met ABS classification standards at the completion of the repairs. Regarding the ballast tank cleaning costs, the Court FINDS that Texaco is liable for the costs to strip the ballast tanks, to obtain gas free certificates, and to handmuck the ballast tanks. These repairs were required to prepare the ballast tanks for the steel repairs. The Court DECLINES to AWARD the claimed cost for ballast water, as Dow failed to present evidence demonstrating its relevance in cleaning the ballast tanks. For the hull coating costs, the Court FINDS that Texaco is liable for the costs for the supplies to paint renewed angles in the ballast tanks. Accordingly, the Court AWARDS Dow damages in the sum of $661,752.60.[61]

---

58. See Defendant's Ex. 598A.

59. Defendant's Ex. 648. The memorandum divided repair costs into seven categories: steel repairs, inspection costs, drydocking costs, ballast tank cleaning, electrical repairs, hull coating costs, and miscellaneous costs. Id.

60. The Court bases its findings on the descriptions of repairs and the invoice amounts listed on the summary chart for repair costs for the barge prepared by the defendant. See Defendant's Exs. 598 & 598A.

61. For a breakdown of the awarded costs of repair, see Appendix. As discussed previously, a memorandum was drafted that categorized the estimated costs of repair for items on the tugboat and the barge. See Defendant's Ex. 648. Witnesses for Dow and Dixie testified that the parties agreed that the memorandum represented estimates for the repairs to the vessels, but there was no evidence presented that the parties incorporated the memorandum into the formal settlement agreement of June 28, 1993. The settlement agreement contains no reference to the May memorandum. See Plaintiff's Ex. 74.

The Court FINDS that the amount of damages chargeable to Texaco for the cost of repairs to the barge is not restricted to the amounts listed in the May 1993 memorandum. There is no indication that the parties intended the memorandum to function as an element of a formal settlement agreement, and the June 28th agreement does not incorporate the memorandum. The Court FINDS, however, that the settlement agreement of June 28th, which required Dow to pay Dixie $963,108.00, establishes the total amount for which Dow may be indemnified by Texaco for the costs of repairs to the barge and the tugboat. While the agreement does not break down the total payment into specific amounts for repairs to the barge or the tugboat or their component parts, the agreement does limit the amount recoverable by Dow for the cumulative repair costs to both vessels. The Court's award of $661,752.60 falls within the amount paid by Dow to Dixie pursuant to the settlement agreement, and the Court FINDS that this amount is based on actual repairs to the barge PLAQUEMINE chargeable to Texaco. This sum is not limited to the total estimated damages to the barge contained in Defendant's

■ The Court FINDS that the evidence is insufficient to justify the award of expenses in two categories. Under the costs associated with drydocking, Dow has claimed costs for actual drydocking, laydays, tug service, gangways and trash service. Based on the testimony of Kenneth Bush and the Colonna's Shipyard receipts submitted by Dow, however, the full scope of repairs undertaken at the shipyard in 1993 were not related to the Dow–Texaco charter party. Dow did not present sufficient evidence at trial to enable the Court to prorate the number of days the barge was drydocked for repairs associated with the Texaco charter party as opposed to the days for other repairs unrelated to Texaco.[62] Instead, Dow sought to recover the total costs for drydocking. The Court DECLINES to AWARD Dow the total costs for drydocking and any partial award could only be based on speculation. The Court further DECLINES to AWARD the costs related to electrical repairs. Dow presented no evidence of their relationship to the Texaco charter party.

## C. Costs for Charter Hire and Insurance

■ In its complaint, Dow alleges that because of Texaco's breach of the charter party, Dow was unable to deliver the tugboat and the barge to Dixie until June 30, 1993. The failure to deliver to Dixie on the original date required Dow to pay the daily rate of $1700 for charter hire, as well as insurance costs. Terry Walker, a Dow employee, testified at trial that Dow paid Dixie $484,797.50 for charter hire for the period between March 5, 1993 and July 3, 1993, and $17,966.44 in insurance costs.[63] Dow seeks indemnification for the costs from Texaco based on Texaco's alleged breach of the charter party.

The Fourth Circuit has held that "when there has been no suspension in the payment of charter hire during the period when the vessel is out of service, the time charterer who has paid the charter hire is entitled to recover what the owner would have been entitled to recover had those payments been suspended." *Venore Transp. Co. v. M/V STRUMA,* 583 F.2d 708, 711 (4th Cir.1978). Therefore Dow, as time charterer under its charter party with Dixie, could potentially recover charter hire paid while the barge was drydocked at Colonna's Shipyard to complete the necessary repairs chargeable to Texaco. Additionally, the Court FINDS that because the tugboat and the barge functioned as an integrated unit, or ITB, Dow could potentially recover for charter hire paid for both vessels. In *Domar Ocean Transportation, Ltd. v. M/V ANDREW MARTIN,* 754 F.2d 616 (5th Cir.1985), the United States Court of Appeals for the Fifth Circuit held that where a barge which was part of a combined tug-barge unit was damaged through the negligence of a third party, the owner could recover for lost use of the tugboat. *Id.* at 619. The court noted that the owner "had a proprietary interest in the [barge] DOMAR 7001 and the [tugboat] CINDY CENAC as a unit.... [and] offered its customers the use of the DOMAR 7001 and the CINDY CENAC as a unit, and not as individual vessels." *Id.* Dow offered Texaco the charter of the PLAQUEMINE and the SEA SKIMMER as an integrated unit, not as separate vessels, and loss of use for one component of the unit would allow recovery for loss of use of both components.

However, the Court DECLINES to AWARD the costs paid by Dow for charter hire and insurance as the evidence presented is insufficient to meet Dow's burden of proving these damages. The Court cannot award the full amount of charter hire and insurance, since the shipyard performed substantial repairs to the barge not chargeable to Texaco during the period of time in issue. Although the total cost of charter hire and insurance is not in dispute, in order to determine the amount of charter hire and insurance proper-

Exhibit 648 nor are the elements of the Court's award limited to the breakdown of estimated costs contained in the exhibit.

**62.** Although daily work orders of Colonna's Shipyard's repairs were introduced, they lacked suffi-

cient detail to enable the Court to prorate time or costs between those chargeable to Texaco and those which were not.

**63.** *See* Plaintiff's Ex. 70.

ly recoverable due to Texaco's breach of the charter party for the barge, the Court must calculate the amount of time and expense devoted to those repairs chargeable to Texaco. As discussed previously with regard to drydocking costs, Dow must rely upon copies of invoices from Colonna's Shipyard that detailed work done to the vessels. The invoices, however, fail to indicate the length of time or total cost necessary to make those repairs chargeable to Texaco. There is no basis for the Court to award the full cost of charter hire and insurance as sought by Dow, and the evidence is insufficient to enable the Court to prorate the amount of time or costs for those repairs chargeable to Texaco.

### D.   Attorney's Fees and Costs

■ In its complaint, Dow requested the Court to award attorney's fees, interest as provided by the charter parties, and prejudgment interest and costs. Texaco, in its counterclaim, seeks the award of attorney's fees, pre- and postjudgment interest and costs. It is well established that the award of attorney's fees and costs is within the discretion of a trial judge. *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (stating that the discretion vested in the trial judge "is appropriate in view of the district court's superior understanding of the litigation"); *Colonial Williamsburg Found. v. Kittinger Co.,* 38 F.3d 133, 138 (4th Cir.1994) ("It is well settled that district courts have considerable discretion in awarding attorneys' fees...."); *see also Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.) (announcing twelve factors to be considered by the district court in calculating an award of attorney's fees), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978). In the present action, the Court DECLINES to AWARD either party attorney's fees, interest or costs. There were genuine issues regarding liability and damages under the charter parties disputed by Dow and Texaco during the trial, and the Court made findings that both parties prevailed in part on these issues. The absence of a clear demonstration of liability by either party in the litigation makes the award of attorney's fees and costs inappropriate.

### IV.   CONCLUSION

The Court **FINDS** that Dow failed to establish that Texaco was liable under the traditional duties established by the maritime law of bailments. The Court **FINDS** that under the charter party, which augments the maritime law of bailments in this case, Texaco assumed two contractual obligations: the duty of maintenance of the vessel and the duty to maintain the vessel in a condition required to meet ABS classification standards. The Court **FINDS** that under the charter party for the tugboat SEA SKIMMER, Texaco did not breach either contractual duty. The Court **FINDS** that under the charter party for the barge PLAQUEMINE, Texaco did not breach its duty to maintain the vessel, but did breach its duty to maintain the vessel in the condition required to meet ABS classification standards. The Court **AWARDS** Dow judgment in the amount of $661,752.60 for the costs of repair to the barge, in accordance with the Court's discussion of damages chargeable to Texaco under the charter party. The Court further **FINDS** that the evidence is insufficient to award Dow its claim for charter hire and insurance.

The Court **ORDERS** that the counterclaim of Texaco be **DISMISSED.** The Court **FINDS** that Dow did not interfere in the redelivery process of the vessels or cause Texaco to incur additional expenses during that process. The Court **DENIES** each party's claim for attorney's fees, costs and prejudgment interest and **ORDERS** that each party bear its costs.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED.**

## APPENDIX
### SUMMARY OF COSTS FOR REPAIRS TO BARGE PLAQUEMINE CHARGEABLE TO TEXACO

**STEEL**
- Audiogauge readings — $ 14,770.15
- Ballast tank internal steel repairs — $408,905.00
- Overtime for ballast tank steel repairs — $1,664.00
- Overtime for painting — $ 7,800.00
- No. 1 starboard cargo tank insert — $2,924.00
- No. 1 starboard cargo tank repairs — $2,924.00
- Side shell repair supplies — $3,699.10
- Painting — $10,250.00

**TOTAL** — $452,936.25

**ABS CONDITION SURVEYS**
- ABS Condition Survey # 361857145 — $ 1,525.00
- ABS Condition Survey # 361857137 — $ 12,605.00

**TOTAL** — $ 14,130.00

**BALLAST TANK CLEANING**
- Strip ballast tanks — $ 3,968.00
- Gas free certificates — $ 8,445.00
- Handmucking of ballast tanks — $180,745.85

**TOTAL** — $193,158.85

**HULL COATING**
- Supplies to paint ballast tanks angles — $ 1,527.50

**TOTAL** — $ 1,527.50

**TOTAL AWARDABLE COSTS** — $661,752.60