**NATIONAL SHIPPING COMPANY OF SAUDI ARABIA, Plaintiff and Defendant on Counterclaim,**

v.

**UNITED STATES of America, Defendant and Counter-Claimant.**

No. Civ.A. 2:98CV1274.

United States District Court, E.D. Virginia, Norfolk Division.

March 31, 2000.

---

## MEMORANDUM OPINION
## AND ORDER

JACKSON, District Judge.

### I. Introduction

This matter is before the Court for decision following a bench trial conducted from October 6, 1999 until October 8, 1999. The matter having been briefed by both parties in trial briefs jointly filed on December 20, 1999, the Court finds this matter ripe for judicial determination.

### II. Legal Standards

Collision liability in admiralty is governed today by the doctrine of comparative negligence. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 410, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The much maligned *Pennsylvania* rule of equal apportionment in admiralty exists only in vestigial form when (1) each vessel's fault is approximately equal or (2) "where proportionate degrees of fault cannot be mea-

sured and determined on a rationale basis." *Id.* at 397, 95 S.Ct. 1708.

The duties governing the conduct of vessels at sea in transit commonly are referred to as the "rules of the road," a phrase that refers to the International Regulations for the Prevention of Collisions at Sea codified at 33 U.S.C. § 1602 (hereafter "Rules of the Road"). The parties conceded at trial that Rule 19, governing the conduct of vessels in restricted visibility, of the Rules of the Road was in-force at the time of the accident. Both Rule 19 and Rule 6 of the Rules of the Road require vessels to proceed at safe speeds under given conditions, and Rule 7 requires proper measures by vessels to (1) determine risk of collision and (2) take steps to mitigate such risks.

### III. Facts

The parties have stipulated to the following facts which the Court accepts and finds:

### A. Stipulated Facts:

1. Plaintiff and Defendant on Counterclaim, National Shipping Company of Saudi Arabia (hereinafter "NSCSA") is the Owner of the M/V Saudi Makkah.

2. Defendant and Counter–Claimant, the United States of America, is the Owner of the USS Jacksonville.

3. The Saudi Makkah is a Ro–Ro container vessel with a breadth of 104 feet 1 inch and a length overall of 657 feet. The Saudi Makkah has a maximum speed of 22 knots.

4. The USS Jacksonville is a nuclear powered submarine with a breadth of 33 feet and a length overall of 360 feet. The USS Jacksonville has an unclassified maximum speed of 18 knots on the surface.

5. At all relevant times, the conduct of both vessels was governed by the International Regulations for the Prevention of Collisions at Sea, 33 U.S.C. § 1602 ("Rules of the Road").

6. Both vessels were power-driven vessels within the meaning of the Rules of the Road.

7. At all relevant times leading up to the collision, both vessels were operating in restricted visibility, within the meaning of the Rules of the Road.

8. At all relevant times leading up to the collision, both vessels were sounding fog signals as required by the applicable rules and regulations.

9. At all relevant times leading up to the collision, both vessels had two radars in operation.

10. At all relevant times leading up to the collision, both vessels' engines were ready for immediate maneuver.

11. At all relevant times leading up to the collision, both vessels were showing the proper navigation lights as required by the Rules of the Road.

12. At all relevant times leading up to the collision, both vessels were on hand steering.

13. The Saudi Makkah was equipped with an automatic course recorder, which records the vessel's true course versus time. The time on the course recorder is four hours ahead of local time, such that the entry for 1300 hours corresponds to 0900 local time. The time on the course recorder is approximately two minutes slow, such that the course for 0900 is approximately 0902 in correct time.

14. The Saudi Makkah was equipped with an automatic engine RPM log which automatically records orders given from the bridge and RPM changes of six or more. The time on the log is five hours ahead of local time, such that 1400 on the tape is 0900 local time.

15. The USS Jacksonville is not equipped with an automatic course recorder or engine RPM recorder, but alterations in course and/or speed are logged in the vessel's deck log.

**Saudi Makkah Activities on and leading up to May 17, 1996:**

1. The Saudi Makkah completed cargo operations at Baltimore, Maryland and sailed from its berth at 2100 hours on May 16, 1996, bound for New York. At the time of sailing, the vessel's drafts were as follows:

   Forward: 28′ 7″

   Aft: 31′ 10″

2. Prior to getting underway, the Third Mate onboard the Saudi Makkah conducted a test of all navigation equipment. All equipment was found satisfactory, and an appropriate log entry was made confirming the tests at 2040 on May 16, 1996.

3. The Saudi Makkah dropped its pilot at 0755 on May 17, 1996, and headed south in the deep water traffic lane towards the "CB" buoy.

4. At the time, the bridge complement onboard the Saudi Makkah consisted of the following:

   Master

   Third Mate

   AB/Helmsman

   AB/Lookout

   All four individuals remained on the bridge through the time of the collision.

5. The Master retained the conn of the vessel throughout. The Master was maintaining a lookout and monitoring targets on the Sperry Automatic Radar Plotting Aid Radar (ARPA), which automatically plots all targets showing their course and speed, and also provides information regarding closest point approach (CPA).

6. The Third Mate was primarily responsible for plotting the vessel's posi-

tion, but was also assisting with lookout function by monitoring the radars and going onto the bridge wings to look for targets and listen for sound signals. Between 0900 and the time of the collision, the Third Mate went back and forth between the forward bridge area, the bridge wings, and the chart room area, which is at the after end of the bridge. The Third Mate plotted all positions on the chart. The positions on the Chesapeake Bay Entrance Chart No. 12221 were taken by the following means:

> 0853 Radar Bearing and Range—CB Buoy
>
> 0900 Radar Bearing and Range—CB Buoy
>
> 0909 Radar Bearing and Range—Chesapeake Light
>
> 0914 Radar Bearing and Range—Chesapeake Light
>
> 0921 Radar Bearing and Range—Chesapeake Light
>
> 0927 GPS Position

7. At 0921, the Third Mate was in the chart room area of the bridge, plotting the vessel's position. He then went out into the forward bridge area, went out onto the bridge wing, and returned to the chart room area. He remained in the chart room area until the time of the collision.

8. The AB/Lookout was stationed on the bridge wing. He alternated between the port and starboard bridge wings, and maintained a lookout for targets and listened for sound signals. There was no lookout posted on the bow.

9. The AB/Helmsman remained at the vessel's wheel, and responded to orders given by the Master.

10. At approximately 0853, the Saudi Makkah rounded the "CB" buoy and gradually changed course to port towards her intended track line of 009°.

## USS Jacksonville Activities On and Leading up to May 17, 1996:

1. At 0800 on May 17, 1996, the USS Jacksonville was on a heading of 270° proceeding at a speed of approximately 12 knots, heading for a point south of Chesapeake Light.

2. At 0810 the vessel reduced speed by "making turns" for 10 knots.

3. At 0835 the USS Jacksonville adjusted its course to 265°.

4. On May 17, 1996, Lt. Woertz was the Officer of the Deck (OOD) from approximately 0545 through the time of the collision.

5. Lt. Woertz, as OOD, made all decisions regarding the navigation of the vessel, including the vessel's course and speed, through the time of the collision.

6. At all relevant times leading up to the collision, Lt. Woertz and a lookout were stationed on the bridge, which is located at the top of the sail on the top of the submarine. In addition, there was a whistle operator stationed on the bridge. The remaining individuals involved with the navigation of the vessel were in the control room which is located below decks, directly below the sail.

7. The Control Room watch team consists of a: (1) quartermaster of the watch, who is responsible to keep the navigation plot of the vessel on a navigation chart; (2) a helmsman; (3) a navigational electronics technician, who is responsible to maintain the ship's inertial navigation equipment; (4) two radar operators; (5) two sonar operators; (6) two fire control technicians, who receive contact positions information from sonar, radar and visual and then develop a contact solution, a bearing, range, course and speed of every contact; and (7) a Contact Coordinator, who is responsible to evaluate all the information from the control room, including radar, sonar, fire control and the quartermaster

and make recommendations to the Officer of the Deck (OOD) concerning courses to avoid contacts.

8. At 0900, Ensign Reed was the Contact Coordinator. Lt. Bobenreith relieved Ensign Reed as Contact Coordinator approximately 10 to 15 minutes prior to the collision.

9. The USS Jacksonville was equipped with a hand-held GPS for use on the bridge, which would allow the OOD to monitor the vessel's position. On May 17, 1996, the GPS was not working.

10. The USS Jacksonville had charts on the bridge for use by the OOD, which allow the OOD to view any obstructions or hazards to navigation in the area where the vessel is transiting. Lt. Woertz did not refer to the charts on May 17, 1996.

11. Lt. Woertz relied on information that he received from the Contact Coordinator, Ensign Reed, and later on, Lt. Bobenreith, in the course of making decisions regarding the course and speed which were made prior to the collision.

12. The Quartermaster, QM2 Prohaski, was stationed in the control room, and was responsible for the navigation of the vessel, which includes plotting the vessel's position, monitoring obstructions and hazards to navigation, and ensuring that the vessel remains on its intended track.

13. There were two radar operators in the control room on the USS Jacksonville. They are responsible to monitor targets and provide information to the Quartermaster and Contact Coordinator. They also provide information regarding targets to fire control, where fire control solutions are prepared, which show each target's course and speed, and information regarding each target's closest point of approach (CPA).

14. The positions on the USS Jacksonville's chart prior to the collision were erased, but the vessel's position is logged in the vessel's position log.

## Maneuvers Around the Time of Collision:

### Saudi Makkah

1. Shortly after steadying up on 009°, the Master of the Saudi Makkah detected a target by radar on the starboard bow.

2. The Master of the Saudi Makkah monitored the target using the automatic plotting mode of the ARPA Radar. The ARPA Radar showed that the target was on a westerly course and had a steady bearing and decreasing range.

3. At approximately 0911, when the vessels were approximately 4.5 miles apart, the Master changed course to starboard, intending to pass underneath the stern of the target.

4. As the vessel's heading passed approximately 035°, counter rudder was applied and approximately two minutes later, the turn to starboard resumed, and the Saudi Makkah steadied up on 073° at approximately 0919.

5. The Master continued to monitor the target, and through the use of the ARPA Radar, the Master determined that the target had altered course to port.

6. Between 0825 and 0918 the Saudi Makkah's shaft RPM increased from 95 RPM to 101 RPM.

7. As the vessels approached, the Master of the Saudi Makkah determined that he had to take action or there would be a collision, and ordered the helm hard to starboard.

8. The Master of the Saudi Makkah first saw the USS Jacksonville on its port bow less than one minute before the collision. At that point, the Master of the Saudi Makkah knew that a collision was inevitable. The Saudi Makkah did not sound a danger signal.

9. The two vessels collided at 0925. At the time of the collision, the Saudi Makkah's bow was swinging to starboard, and its heading was approximately 105°.

10. At no time prior to the collision did the Saudi Makkah slow her speed.

## USS Jacksonville

1. At approximately 0905, the USS Jacksonville was showing a target on its radar detected on its port bow at a distance of approximately 6.8 miles.

2. At 0905, Ensign Reed was acting as the Contact Coordinator. He was standing his first watch as Contact Coordinator.

3. The Executive Officer onboard the USS Jacksonville was concerned that given the vessel's location and the prevailing conditions, Ensign Reed did not have sufficient experience to act as Contact Coordinator. As a result, the Executive Officer asked Lt. Bobenreith to relieve Ensign Reed.

4. At approximately 0900 Lt. Bobenreith was informed by the Executive Officer that he was to relieve Ensign Reed as the Contact Coordinator. Lt. Bobenreith reported to the control room and began the turnover process with Ensign Reed.

5. Lt. Bobenreith took over as Contact Coordinator at approximately 0910, approximately 15 minutes prior to the collision.

6. Lt. Bobenreith determined that the target on the port bow (Saudi Makkah) was on a northerly course with a steady bearing, and minimal closest point of approach (CPA).

7. The vessels were not in a close quarters situation, but Lt. Bobenreith believed that it was necessary to take action to prevent a close quarters situation from developing.

8. The OOD, Lt. Woertz, asked Lt. Bobenreith if it was safe to alter course to starboard to avoid the target on the port bow (Saudi Makkah).

9. Lt. Woertz, the OOD, and Lt. Bobenreith, the Contact Coordinator, were aware that the applicable Rules of the Road required that, if possible, a course change to port should be avoided.

10. Lt. Bobenreith asked the Quartermaster, Mr. Prohaski, if it was safe to alter course to starboard. Quartermaster Prohaski advised Lt. Bobenreith that a course change to starboard was not advisable.

11. Lt. Bobenreith followed Quartermaster Prohaski's advice and recommended to the OOD that he change course to port to 170°.

12. Lt. Bobenreith made the recommendation to change course to port within 2–3 minutes after he relieved as Contact Coordinator.

13. At 0913, the USS Jacksonville changed course to 170° in order to prevent a close quarters situation from developing with the Saudi Makkah.

14. Shortly after the USS Jacksonville was steady on 170°, Lt. Bobenreith determined that the Saudi Makkah had turned to starboard, and again, the vessels were approaching so as to involve risk of collision. Lt. Bobenreith passed that information to Lt. Woertz, the OOD.

15. Lt. Bobenreith recommended to Lt. Woertz that he change course to port to 135°, and increase speed to ahead standard. At 0921, Lt. Woertz followed that recommendation, changing course to 135° and increasing RPM to ahead standard, which corresponds to making turns for 15 knots.

16. After the course change to 135°, the Commanding Officer. Cdr. Yarbro, went to the bridge and remained on the bridge until the collision.

17. The USS Jacksonville remained on its course of 135° until personnel on

the bridge of the saw the Saudi Makkah visually.

18. Upon seeing the Saudi Makkah visually, Lt. Woertz immediately ordered left full rudder and all back full, and then back emergency.

19. The starboard side of the USS Jacksonville and port bow of the Saudi Makkah collided at 0925.

20. At the time of the collision, the USS Jacksonville was on a course of approximately 120° and the bow was swinging to port.

21. Cdr. Yarbro, the Commanding Officer, never took the conn from the time the target was first detected through the time of the collision.

**Damages:**

1. The U.S. Navy's total recoverable damages are $3,680,545.00.

2. NSCSA's recoverable damages relating to physical damages are in the amount of $443,752.07.

3. The Saudi Makkah was out of service for 17:42 days as a result of the collision.

**B. Findings of Fact**

In addition to the facts stipulated to between the parties, having conducted a trial, the Court makes the following factual findings:

1. When the USS Jacksonville and Saudi Makkah collided at 0925, the Saudi Makkah was traveling 16.5 to 17 knots and the USS Jacksonville was traveling 13 knots.

2. At the time of the collision the speed of each vessel was excessive and unsafe given the restricted visibility.

3. At approximately 0911–0913, notwithstanding excessive speed of each vessel, there was ample time and opportunity to avoid a collision.

4. At two nautical miles apart, both vessels were in "close quarters" and both vessels were required to reduced speed.

5. Despite restricted visibility, between 0825–0918, the Saudi Makkah was increasing its speed.

6. The stopping distance of the Saudi Makkah was approximately .6 miles.

7. Consistent with the Rules of the Road, at 0911, the Saudi Makkah turned starboard.

8. At approximately 0913, the USS Jacksonville, in violation of the Rules of the Road, changed its course to port.

9. The USS Jacksonville had several options to avoid collision which included:

(a) turn to starboard,

(b) reduce speed,

(c) reverse course, and

(d) stop.

10. At 0910, the USS Jacksonville changed the contact coordinator who then recommended both turns to port to the Officer of the Deck.

11. During the effort to avoid the collision the Executive Officer and Captain did not take the conn of the USS Jacksonville.[1]

12. The Executive Officer was tired and suffering from fatigue.

13. The USS Jacksonville had no satisfactory explanation for its two decisions to turn port to avoid the collision.

14. The radar repeater and GPS were not working in the USS Jacksonville's bridge.

15. Prior to the collision, the Captain of the Saudi Makkah did not properly use his computer collision avoidance system, that is the PAD mode of the Sperry radar.

---

1. The Sonar Open Microphone Tape Transcript, Trial Exhibit 23, indicates the Captain assumed the conn at 0927, after the collision. *See* Trial Exhibit 23 at 4.

16. Before the collision the USS Jacksonville made radio calls to the Saudi Makkah giving incorrect information about the USS Jacksonville's location.

17. Given the restricted visibility, the Saudi Makkah failed to post properly a lookout to detect vessels not detectable by radar where it posted its lookout 100 yards from the bow of the vessel.

18. During the attempt to avoid collision, the navigator of the USS Jacksonville was not consulted.

19. In management of the collision, the USS Jacksonville had faulty and defective command and control among its crew.

20. Among the options the USS Jacksonville could exercise to avoid collision, the turn to port was the only option which was prohibited under the Rules of the Road.

21. The USS Jacksonville presented a low radar profile in the water, thereby causing the Captain of the Saudi Makkah to conclude the USS Jacksonville was a vessel without radar.

22. After first detecting the Saudi Makkah, the Commanding Officer of the USS Jacksonville left the Control Room and went to his quarters to change uniforms. The Commanding Officer was not present during decision about and execution of the first turn to port, but instead monitored the USS Jacksonville's crew via a speaker.

## IV. Discussion

### A. Conclusions of Law

The Court reaches the following conclusions of law:

1. This is a case of admiralty and maritime jurisdiction and this Court has jurisdiction pursuant to 28 U.S.C. § 1333, the Public Vessels Act, 46 App.U.S.C. §§ 781–790, and the Suits in the Admiralty Act, 46 App.U.S.C. §§ 741–752.

2. Venue lies in the Court in accordance with 46 App.U.S.C. § 782 as the plaintiff is a business entity organized and existing under the laws of Saudi Arabia and the USS Jacksonville (SSN–699) was within the territorial jurisdiction of the United States and this District at the time of the filing of the Complaint herein. All parties are subject to the *in personam* jurisdiction of this Court.

3. At all relevant times, the conduct of both vessels was governed by the International Regulations for the Prevention of Collisions at Sea, 33 U.S.C. § 1602 ("Rules of the Road"). Particularly applicable to the facts at hand are: Rule 2, Responsibility; Rule 5, Lookouts; Rule 6, Safe Speed; Rule 7, Risk Collision; Rule 8, Action to Avoid Collision; Rule 19, Conduct of Vessel in Restricted Visibility; and Rule 34, Maneuvering and Warning Signals.

4. "Aside from official rules of navigation and statutory directions, prudent seamanship is demanded of the mariner. Default in its exercise is negligence. A collision course reasonably observable, visually or otherwise, must be avoided." *Miller v. Semet Solvay Div., Allied Chem. Corp.*, 406 F.2d 1037, 1038 (4th Cir.1969).

5. At all relevant times leading up to the collision, both vessels were operating in restricted visibility, within the meaning of the Rules of the Road, 33 U.S.C. § 1602, Rule 3.

6. Liability for maritime collisions is allocated proportionately to the comparative degree of fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

7. "[A] vessel which violates a statutory duty of the road [must] prove that the violation could not have contributed to the collision to avoid liability."

*Yarmouth Sea Products Ltd. v. Scully,* 131 F.3d 389, 394 (4th Cir.1997).

8. Any negligent act or omission will not be held to be the proximate cause of the collision, where, but for the intervening negligence of another, the collision would not have occurred. *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5–3 at 165–66 (2d ed.1994); *Buckman v. Bombardier Corp.,* 893 F.Supp. 547 (E.D.N.C. 1995).

9. The USS Jacksonville's course change to port at 0913 was negligent, and in violation of the Rules of the Road, 33 U.S.C. § 1602, Rule 19 which states in part as follows:

(d) A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collusion exists. If so, she shall take avoiding action in ample time, provided that when such action consists of an alteration of course, so far as possible the following shall be avoided:

(I) An alteration of course to port for a vessel forward of the beam, other than for a vessel being overtaken;

(ii) An alteration of course toward a vessel abeam or abaft the beam.

10. The proximate cause of the casualty was the USS Jacksonville's first course change to port.

11. The Saudi Makkah contributed to the collision in maintaining an unsafe speed, failing to post proper lookouts, and failing to utilize available equipment properly. However, the Saudi Makkah actions are not an intervening cause of the collision such as to "break the chain of proximate causation...."

*Exxon Co. USA v. Sofec, Inc.,* 517 U.S. 830, 832, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).

12. The Saudi Makkah violated Rules 5, 6, 7, 8, 19, and 34 of the Rules of the Road. 33 U.S.C. § 1602.

13. The USS Jacksonville also violated Rules 2, 5, 6, 7, 8, and 19 of the Rules of the Road, 33 U.S.C. § 1602.

14. The USS Jacksonville's second turn to port was further in violation of Rule 8 which requires that all turns be sufficient to result in passing at a safe distance. The USS Jacksonville's turn to port at 0921 did not meet this requirement and was insufficient.

## B. Summary of Statutory Violations and Negligence of the USS Jacksonville

The USS Jacksonville is a Los Angeles class nuclear submarine under the command of officers of the United States Navy. These officers, called upon to safely navigate their vessel through the depths of the ocean regularly, inexplicably failed to navigate their vessel safely while entering Chesapeake Bay.

The Officers were well aware that their vessel, designed for minimal detection, presented a poor radar signature and visibility at sea. In the context of these events, where there is restricted visibility, the decision to enter Chesapeake Bay at a speed of 16.5 to 17 knots represented a violation of the Rules 6 and 19 of the Rules of the Road.[2] The decision of the USS Jacksonville crew to execute two port turns, in violation of the established Rules of Road, without seeking the input of the navigator, fails to meet the duties imposed by law on the USS Jacksonville.[3]

It is undisputable that a close-quarters situation was developing at 0913. The

---

2. Rule 6 states in pertinent part that "[e]ach vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision...." Rule 19(b) requires that "[e]very vessel shall proceed at a safe speed adopted to the prevailing circumstances and conditions of restricted visibility."

3. As previously noted, Rule 19(d) requires avoidance of port maneuvers in close quarter situations in restricted visibility "so far as possible."

United States Court of Appeals for the Fourth Circuit held in *Hellenic Lines, Ltd. v. Prudential Lines,* 730 F.2d 159 (4th Cir.1984), that "any passing distance under two miles is close quarters in a fog." *Id.* at 164. It is within this rapidly developing context that the USS Jacksonville made the ill advised first decision to execute a port turn.

The Court of Appeals holds that Rule 19's mandate against port turns in collision avoidance is not advisory, but instead mandatory. *Id.* "These are internationally adopted rules which are to control in ships of all nations.... The captain of a ship, regardless of the ship's country of registration or its port of call or the language of its crew, must be able to rely upon other ships complying ... and never turning to port when it is forward of the beam of another vessel and in a close-quarters situation." *Id.* at 165. The officers of the USS Jacksonville, even as they made the decision to make a port turn, were aware of the mandate against port turns.

Additionally, the Officer of the Deck, despite good intentions, found himself on the bridge with little support. The sudden substitution of the contact coordinator contributed to the lack of information and support necessary for the Officer of the Deck to make reasoned decisions. During live testimony to the Court, Lt. Woertz, stated that he requested information and recommendations from the remaining officers and crew, but essentially only received the two recommendations of port turns.

The explanations the United States offered for the port turn do not support the ultimate decision, but instead reflect a poor decision making process that resulted in a faulty recommendation implemented by a young officer standing on the bridge. Isolated on the bridge, with poor visibility himself,[4] Lt. Woertz opted not to consult

the charts on the bridge for fear of losing them over the side in the winds, but also was denied use of the bridge radar repeater and GPS unit on the bridge himself. In short, a breakdown of command and control occurred at the critical moments when a decision needed to be made. The acquiescence of the senior command structure of the USS Jacksonville to the decisions of the watch officers rise to the level of negligence that will be imputed against the government.

The USS Jacksonville executed a second turn in the final moments before the casualty. The Court finds this second turn to be of such a small nature, that it bears little, if any, relation to the collision that occurred, except to say that it was insufficient to prevent the ultimate collision. At best, these final maneuvers minimized damage to the vessels by allowing a glancing blow, as opposed to a direct collision.

## C. Summary of Statutory Violations and Negligence of the Saudi Makkah

The Saudi Makkah is a large container ship with unwieldy control characteristics. The vessel, due to its size and weight, required significant space and time to execute fully any desired maneuvers, including coming to a stop. Despite these qualities about the vessel, the Master of the Saudi Makkah continually increased speed throughout the period before the collision. Under poor visibility conditions, this unsafe speed constituted an act of negligence and a statutory violation.

Courts have previously announced that the failure to use sophisticated radar properly constitutes violation of Rule 7(b). *See In re G & G Shipping Co., Ltd.,* 767 F.Supp. 398, 409 (D.P.R.1991). "To establish liability, however, from the negligent use of radar equipment a causal connection with a subsequent accident must be shown." *White Stack Towing Corp. v.*

4. Testimony of Mr. Clevenger, Control Room Supervisor of the USS Jacksonville at the time in question, described this as "the worst scenario you can have, which you can't see

300 feet ahead of you, and relying on all the sensors to give [the contact coordinator, Ensign Reed] the solutions...." Trial Transcript Vol. II at 130.

*Bethlehem Steel Co.*, 279 F.2d 419, 423 (4th Cir.1960).

First, the Court finds that the Master of the Saudi Makkah did make proper use of his radar unit at the time in question. As a result, despite the information provided by the unit, the Master did not fully grasp the rapidly deteriorating situation.[5] The Master of the Saudi Makkah further concedes that he did not utilize the PAD mode of his radar unit. The PAD mode, short for "Predicted Area of Danger," permits the imaging of various radar targets within six-sided boxes allowing the operator to visualize the clearance necessary for each vessel safely to pass one another. The Court finds that the failure to use the PAD mode of the Saudi Makkah's radar unit deprived the master of the best possible understanding of the tactical situation developing. The Plaintiff suggests, through the testimony of the Saudi Makkah master and through expert witness testimony, that failure to utilize the PAD mode was acceptable as a matter of personal preference of a mariner. The Court finds this not credible. The Court instead finds the failure to use a particular mode of a radar unit, in the absence of good reason,[6] akin to a decision not to use radar in the first place.

■ It is well established that a master may not, as a matter of personal preference, fail to use radar. *See Afran Transp. Co. v. Bergechief*, 274 F.2d 469, 474 (2d Cir.1960). It remains true that, "[a] master has no more discretion to disregard this aid to navigation than he has to disregard the use of charts, current tables and soundings where the circumstances require the use thereof." *Id.* The government's expert witness demonstrated to the Court's satisfaction that the PAD display would have provided depth of understand-

ing to the Saudi Makkah's master and should not have been disregarded. The Court, however, balances this with overall recognition of the reduced radar profile of a nuclear submarine proceeding along at surface level.

Notwithstanding the decision to ignore the PAD mode of the unit, the Saudi Makkah's master did possess sufficient tracking information to know that the USS Jacksonville had executed a port turn. Captain Obied chose not to reduce speed, nor take further actions. The Captain offers that he feared loss of maneuverability if he chose to reduce speed. The Court, however, concludes that the Saudi Makkah violated Rule 8 in failing to take any adequate action at all to prevent the eventual collision once the port turn of the submarine had been detected. The eventual starboard turn ordered by the Saudi Makkah came too late to be effective in preventing the collision.

Lastly, despite the expert opinion to the contrary, the Court finds that the Saudi Makkah posted insufficient lookouts given the reduced visibility conditions. The positioning of lookouts would have provided earlier warning to the Saudi Makkah of the approach of the USS Jacksonville based on audio or visual observations of said lookouts. *See In re Waterstand Marine, Ltd.*, 1991 A.M.C. 1784, 1988 WL 78776 at *8 (E.D.Pa. July 26, 1988) (recognizing that even in a restricted vision situation a lookout might still have heard a fog signal early enough to prevent a collision). As noted earlier, both vessels sounded fog warnings as required.

**D. Allocation of Responsibility**

■ The port turn of the USS Jacksonville set in motion a chain of events leading

5. The Court specifically notes that the Captain admits that upon acquisition of the USS Jacksonville on radar he never lost the target. *See* Obeid Deposition Transcript at 71.

6. The Court does not rule out the possibility that where the selection of the PAD mode

would generate false or misleading information or serve as a distraction from navigation that a master may then choose to not use this radar mode. However, the Court is not persuaded such a situation exists from the record now before the Court.

to the collision between the vessels. The speed of both vessels contributed to the situation. Also contributing to the collision was the failure of the Saudi Makkah to consult the PAD readout of its radar unit. The negligence of the Saudi Makkah, while contributory to the overall collision, is not of a nature or quality sufficient to break the causal chain of the USS Jacksonville.

The Supreme Court fundamentally altered collision at sea under admiralty in adoption of the comparative fault doctrine in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 410, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The Court now is directed to apportion responsibility for the collision between the parties. The Court, having rejected the government's argument that the Saudi Makkah's actions represented a superseding cause, now examines the apportionment of liability.

■ The Court weighs heavily the USS Jacksonville's first port turn in the apportionment of damages. The rules are clear and the officers all testified as to their familiarity with the base principle of no port turns. This heavy emphasis on the port turn is consistent with the importance attached to Rule 14 in this judicial circuit, as well as the findings of other courts. *See In re Hellenic Lines, Ltd.*, 730 F.2d at 165 (directing that the district court should consider a port turn in apportioning responsibility for the collision); *In re G & G Shipping Co., Ltd.*, 767 F.Supp. at 407 ("This direct violation of Rule 14 requires the Court to weigh it heavily in apportioning the respective degrees of fault.").

Thus, the Court concludes that the USS Jacksonville bears the greater portion of responsibility for this collision, largely predicated upon the failure to adhere to the Rules of the Road in executing the first port turn. Responsibility for the damages is set for the USS Jacksonville at eighty percent (80%); the Saudi Makkah is assessed responsibility for the remaining twenty percent (20%).

## E. Assessment of Damages

Both parties presented stipulated evidence as to the amount of repair damages each party incurred as a result of the casualty. The Saudi Makkah's owners additionally introduced evidence as to the lost income caused by the Saudi Makkah's unavailability to ply her trade route while in for repairs. The United States argues that the Saudi Makkah's owner, NSCSA is not entitled to recovery for loss of use as the owners have not demonstrated that the Saudi Makkah lost revenue while in for repairs.[7]

Plaintiff introduced exhibit evidence and testimony from a corporate officer of the Plaintiff. The officer and exhibit offer an "average daily revenue" figure; this figure representing the average revenue generated by the three voyages before and the three voyages after the casualty by the Saudi Makkah, broken down into daily increments. The Plaintiff also proposes to offset this average daily revenue with the savings the Plaintiff realized by not having to crew and operate the Saudi Makkah while she was in for repair. The Government, however, points out that Plaintiff's exhibit shows regular financial losses by the Saudi Makkah in her voyages.[8]

---

7. Loss of use damages in admiralty are known as "detention damages" and sometimes as "demurrage." *See Bouchard Transp. Co. v. Tug Ocean Prince*, 691 F.2d 609, 612 n. 2 (2d Cir.1982).

8. The United States also directs the Court's attention to *Dow Chemical Co. v. The M/V Roberta Tabor*, 815 F.2d 1037 (5th Cir.1987). In that decision, the United States Court of Appeals for the Fifth Circuit held that a district court correctly denied detention damages when the plaintiff failed to prove the absence of surplus barge capacity. The inference being, where a party has excess capacity within their fleet so that business is not lost, compensation for loss of use should be denied. The Court, although noting the decision, finds it to be an inappropriate analogy to the present facts.

■ In analyzing the propriety of detention damages, the United States Court of Appeals for the Fourth Circuit instructs that the key to recovering detention damages is the ability to show "loss of profits with reasonable certainty." *Yarmouth Sea Products Ltd. v. Scully*, 131 F.3d 389, 395 (4th Cir.1997) (internal quotation marks omitted).

While what constitutes "reasonable certainty" is of necessity a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be determined on a case-by-case basis, it has been said that this process usually involves "a showing in commercial cases that the vessel 'has been engaged, or was capable of being engaged in profitable commerce....'"

*Id.*

■ Average daily revenue is not a concept the Court finds in the admiralty case law as a method used to determine detention damages. The United States Court of Appeals for the Second Circuit permitted average *profits per diem* to be used in determining detention damages in the case of *Moore–McCormack Lines, Inc. v. Esso Camden*, 244 F.2d 198, 201 (2d Cir.1957). However, the Plaintiff cannot possibly show average daily profits, as the vessel did not enjoy an overall profit on most relevant voyages according to the financial statement submitted to the Court.

The Court, having examined the financial documents submitted and reviewed the testimony of the NSCSA officer, concludes that the Plaintiff did not meet its burden to prove detention damages. The existence of regular losses by the Saudi Makkah in her voyages severely undermines any claim for lost profits. On this evidence, the Court can not conclude that the claimed lost profits, if any profits at all, are reasonably certain. *Cf. Marine Office of America Corp. v. M/V Vulcan*, 891 F.Supp. 278, 288 (E.D.La.1995) (declining to award loss of use damages where the damaged vessel "had not been engaged in profitable commerce and was not in any realistic, immediate demand so that profits could reasonably be supposed to have been lost."). Therefore, Plaintiff will not be awarded damages for loss of use of the vessel for the 17.42 days.

## E. Application of Pre-judgment Interest

■ The Supreme Court's decision in *City of Milwaukee v. Cement Division, National Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995), holds that pre-judgment interest is to be awarded routinely in admiralty cases. "[A]s a general rule ... pre-judgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *Id.* at 195, 115 S.Ct. 2091. Pre-judgment interest is part and parcel of ensuring an injured party is compensated fully for its loss. *See id.* The Court notes that pre-judgment interest is not automatically conferred and may be barred under certain circumstances, such as undue delay by the prevailing party in bringing suit. *See id.* at 196, 115 S.Ct. 2091.

■ Pre-judgment interest in admiralty is an element of damages, "part of full and fair compensation to the injured party." *Ameejee Valleejee & Sons v. M/V Victoria U.*, 661 F.2d 310, 313 (4th Cir. 1981). In establishing the proper rate for pre-judgment interest, the Court is not bound by the state statutory minimums, *see id.* at 313–14, not obligated to adopt the prevailing commercial lending rate, *see id.*, nor required to impose the maximum interest rate, *see id.*

■ In this case, the party with the greater damage, the United States, also is the party with the greater responsibility for the collision. The Plaintiff, despite a smaller degree of fault for the collision, will bear a greater burden in the end due to the peculiar nature of the vessel struck—a fragile submarine of the United States Navy. The notion that one takes your victim as you find him, remains an accepted part of the legal lexicon in this respect. The Supreme Court declared in

*City of Milwaukee* that while "it might appear somewhat inequitable to award a large sum in prejudgment interest against a relatively innocent party," that "any unfairness is illusory, because the relative fault of the parties has already been taken into consideration in calculating the amount of the loss for which" each party is responsible. *City of Milwaukee,* 515 U.S. at 198, 115 S.Ct. 2091. Thus, pre-judgment interest is required in the absence of any other peculiar or exceptional circumstances.[9]

However, resolution of the details relating to pre-judgment interest are not so simple. Pre-judgment interest is awarded customarily from the date of the casualty in admiralty law. As for establishing the rate of pre-judgment interest, courts frequently consult the Congressionally mandated post-judgment interest provision contained at 28 U.S.C. § 1961, where the rate of interest varies with the rate on fifty-two week United States Treasury bills.

In the instant case, however, both parties are adjudged liable for the collision and both parties sustained damages. This scenario implicates the statutory scheme for public vessels created by Congressional mandate that vary the traditional approaches that typify admiralty awards. Section 782 of the appendix to Title 46 of the United States Code bars pre-judgment interest against the United States.[10] *See Adams v. United States,* 64 F.Supp.2d 647 (S.D.Tex.1999) (denying pre-judgment interest where a claim is authorized by the Public Vessels Act).

Two cases discuss the seeming inequity worked by the present statutory scheme.

*See Stoddard v. Ling–Temco–Vought, Inc.,* 513 F.Supp.314, 330 (C.D.Cal.1981); *In re Sincere Navigation Corp.,* 447 F.Supp. 672, 676 (E.D.La.1978).

In Louisiana, a district court in *In re Sincere Navigation Corp.,* noted that "it is anomalous that the claims bear interest at different rates, and in part for different periods, [but] the result is required by statutes enacted by the United States in its sovereign capacity." *In re Sincere Navigation Corp.,* 447 F.Supp. at 676. In that case, the United States was a source of contribution for an existing defendant who bore a liability adjudged with a six percent per-judgment interest component.[11]

The Court, noting the anomalous results called for by the peculiar facts of this case, nonetheless is required to apply the statutory scheme set forth by Congress. No pre-judgment interest shall be awarded to the Plaintiff; the Defendant shall benefit from pre-judgment interest running from the date of the casualty.

The Court further finds the post-judgment interest rate scheme set forth at 28 U.S.C. § 1961, to be the fairest rate in this case to determine the pre-judgment rate. *See In re The H.P. King Co.,* 64 B.R. 487, 491 (Bankr.E.D.N.C.1986) (adopting and discussing the use of 28 U.S.C. § 1961 for pre-judgment interest in the absence of peculiar circumstances). Section 1961 refers to the 52–week Treasury bill interest rate, that rate at which the United States Treasury Department borrows funds. The United States, here the party receiving the favor of pre-judgment interest, borrowed funds in the auction of April 25, 1996 at a rate of 5.60%. The auction of April 25, 1996 was the last such auction before the colli-

---

**9.** Pre-judgment interest is barred against the United States, perhaps undercutting the logic of *City of Milwaukee. See* 46 App. U.S.C. § 782 ("[N]o interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for the payment of interest.").

**10.** The United States Court of Appeals for the Fourth Circuit held in *Blevins v. United States,* 769 F.2d 175 (4th Cir.1985), that despite the

real conflict between the language of the Suits in Admiralty Act and the Public Vessels Act, the mandate of the Public Vessels Act, 46 App. U.S.C. § 782, entirely barring prejudgment interest controls. *See id.* at 180 n. 2.

**11.** The Court specifically noted there that if suit had been made against the United States directly, that pre-judgment interest would have been barred by the Public Vessels Act.

sion. *See* 28 U.S.C. § 1961. The interest is to be compounded annually. *See Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 950 F.Supp. 904, 911 (E.D.Wis.1996) (compounding pre-judgment interest annually following remand by the Supreme Court), *aff'd* 144 F.3d 1111 (7th Cir.1998).

### F. Costs and Attorney's Fees

■ Both parties seek attorney's fees and costs incurred. "The district court has wide discretion in deciding motions for attorneys fees in admiralty cases. Such motions are granted infrequently." *Ost–West–Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 177 (4th Cir.1998).

■ In the present action, the Court finds neither party should be awarded attorney's fees or costs. There were genuine issues regarding liability and damages and the Court made findings that both parties prevailed in part on these issues. The shared liability of the parties makes the award of attorney's fees and costs inappropriate. *See Dow Chem. Co. v. Texaco Ref. & Mktg., Inc.*, 887 F.Supp. 853, 874 (E.D.Va.1995) (denying fees and costs where there were genuine issues regarding liability and damages and both parties prevailed in part).

### V. Conclusion

Plaintiff is thus twenty percent (20%) liable for the collision and sustained resultant damages of $443,752.07. Defendant is eighty percent (80%) liable for the collision and sustained damages of $3,680,545.00. Defendant is liable to the Plaintiff for 80% of the Plaintiff's damages, calculated to be $355,001.66. Plaintiff is liable to the Defendant for 20% of the Defendant's damages, calculated to be $736,109.00. Therefore, the Court **FINDS** damages in the amount of $381,107.34, giving account for any offset, in favor of the Defendant.[12]

Pre-judgment interest is **ORDERED** from the date of collision through the date of entry of judgment at a rate of 5.60%,[13] compounded annually. Post-judgment interest is **ORDERED** in accordance with 28 U.S.C. § 1961 until judgment is satisfied. The parties are **ORDERED** to submit a stipulated calculation of the pre-judgment interest accrued to the Court within twenty (20) days of the date of this Order, following which the Clerk of the Court will enter judgment as directed by the Court on April 25, 2000.

The Clerk of the Court is **DIRECTED** to send copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

---

**12.** Set-off is made as of the date of the accident, in adherence to the general common law rule permitting such set-offs when available. *See National Risk Underwriters, Inc. v. Occidental Fire & Cas. Co. of N.C.*, 931 F.2d 1015, 1016–17 (4th Cir.1991) (finding no error in district court set-off of two arbitration awards prior to application of pre-judgment interest calculations); *Huffman Towing Inc. v. Mainstream Shipyard & Supply, Inc.*, 388 F.Supp. 1362, 1371 (N.D.Miss.1975) (applying set-off and then calculating pre-judgment interest in an admiralty action).

**13.** *See Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 827 (9th Cir.1988) (finding no abuse of discretion in trial court's setting a single, constant rate of pre-judgment interest at the 52 week Treasury rate from the sale immediately preceding the collision).